1   Leslie V. Payne, TX Bar No. 00784736 (*pro hac vice*)
    lpayne@hpcllp.com
2   Eric J. Enger, TX Bar No. 24045833 (*pro hac vice*)
    eenger@hpcllp.com
3   Allan Bullwinkel, TX Bar No. 24064327 (*pro hac vice*)
4   abullwinkel@hpcllp.com
    HEIM, PAYNE & CHORUSH L.L.P.
5   600 Travis Street, Suite 6710
    Houston, Texas 77002-2912
6   Telephone: (713) 221-2000
    Facsimile: (713) 221-2021
7
8   *Attorneys for Implicit L.L.C.*

9

10

11

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IMPLICIT L.L.C., | Case No. 3:14-cv-02856-SI |
| Plaintiff, | |
| vs. | **IMPLICIT'S PATENT LOCAL RULE 4-5 OPENING CLAIM CONSTRUCTION** |
| F5 NETWORKS, INC. | |
| Defendant. | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

I.    Introduction ............................................................................................................ 1

II.   Claim Construction Legal Standards .................................................................... 2

III.  Overview of Technology Field and Pre-'683 Network Processing ......................... 4

      A.    General Technical Background ..................................................................... 4

      B.    Mosberger's Scout System (Circa 1997)...................................................... 5

IV.   The '683 Invention as Disclosed in the Patent Specification................................ 8

V.    "Sequence/List of Routines" Should Be Given Their Ordinary Meaning ................ 11

      A.    The Plain Language of the Independent Claims and Claim Context Support the
            Ordinary Meaning ........................................................................................ 12

      B.    The Plain Language of the Dependent Claims Supports the Ordinary Meaning ................. 15

      C.    The '683 Claims Do Not Include the '163/'857 Claim Limitations ..................................... 16

      D.    The Specification Supports the Ordinary Meaning ............................................................ 17

      E.    The '683 Prosecution History Supports the Ordinary Meaning.......................................... 18

      F.    The Pre-'683 Prosecution Histories Do Not Change the Ordinary Meaning....................... 19

VI.   F5 Has Mischaracterized the Alleged Disavowal in Its Proposed Construction ........................ 23

VII.  The Orders From the First F5 Case Do Not Change the Ordinary Meaning .............................. 24

VIII. Conclusion.................................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*01 Communique Lab., Inc. v. LogMeIn, Inc.,*
  687 F.3d 1292 (Fed. Cir. 2012).....................................................................4

*3M Innovative Properties Co. v. Tredegar Corp.,*
  725 F.3d 1315 (Fed. Cir. 2013)....................................................................19

*Advanced Cardiovascular Sys. v. Medtronic, Inc.,*
  265 F.3d 1294 (Fed. Cir. 2001)....................................................................23

*Alcon Research, Ltd. v. Apotex Inc.,*
  687 F.3d 1362 (Fed. Cir. 2012)................................................................3, 15

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,*
  249 F.3d 1341 (Fed. Cir. 2001)....................................................................12

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.,*
  183 F.3d 1334 (Fed. Cir. 1999)......................................................................2

*Cordis Corp. v. Medtronic AVE, Inc.,*
  339 F.3d 1352 (Fed. Cir. 2003)......................................................................3

*Cordis Corp. v. Medtronic Ave, Inc.,*
  511 F.3d 1157 (Fed. Cir. 2008)....................................................................24

*Finjan, Inc. v. Secure Computing Corp.,*
  626 F.3d 1197 (Fed. Cir. 2010)....................................................................12

*Grober v. Mako Prods., Inc.,*
  686 F.3d 1335 (Fed. Cir. 2012)......................................................................4

*Hill-Rom Servs. v. Stryker Corp.,*
  755 F.3d 1367 (Fed. Cir. 2014)....................................................................18

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
  381 F.3d 1111 (Fed. Cir. 2004)......................................................................2

*Intamin, Ltd. v. Magnetar Techs., Corp.,*
  483 F.3d 1328 (Fed. Cir. 2007)....................................................................15

*Invitrogen Corp. v. Clontech Labs., Inc.,*
  429 F.3d 1052 (Fed. Cir. 2005)....................................................................23

*Netcraft Corp. v. eBay, Inc.,*
  549 F.3d 1394 (Fed. Cir. 2008)....................................................................20

*Omega Eng'g, Inc. v. Raytek Corp.,*
  334 F.3d 1314 (Fed.Cir.2003)........................................................................4

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................2, 3, 15

*Renishaw PLC v. Marposs Societa' per Azioni,*

158 F.3d 1243 (Fed. Cir. 1998) ................................................................................. 3

*SanDisk Corp. v. Memorex Prods., Inc.*,
415 F.3d 1278 (Fed. Cir. 2005) ................................................................................. 4

*Saunders Grp., Inc. v. Comfortrac, Inc.*,
492 F.3d 1326 (Fed. Cir. 2007) ............................................................................... 22

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
279 F.3d 1357 (Fed. Cir. 2002) ................................................................................. 3

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ............................................................................. 3, 4

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997) ............................................................................... 12

*Ventana Med. Sys. v. Biogenex Labs.*,
473 F.3d 1173 (Fed. Cir. 2006) ............................................................................... 23

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ........................................................................... 4, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) ....................................................................... 3, 4, 18

**Statutes**

35 U.S.C. § 112 ................................................................................................... 2, 15

## I.  Introduction

This is the second case between Implicit and F5 before this Court. Implicit asserts that F5's TMOS-based network processing products infringe U.S. Patent No. 8,694,683 (the "'683 patent"). After the Court granted summary judgment in F5's favor in the first case, related to two other Implicit patents (U.S. Patent Nos. 6,629,163, the "'163 patent," and 7,711,857, the "'857 patent"), Implicit applied for and was granted the '683 patent. F5's proposed construction and purported support essentially ignore that the '683 patent is a *different* patent with *materially different* claims.[1] The '683 patent claim terms omit the exact limitations that F5 now tries to import. Because claim terms define the scope of a patent, and no purported disavowal can apply to materially different claim terms, F5's blatant attempt to construe a patent *other than the patent-in-suit* fails.

The parties agreed to an early *Markman* hearing limited to a single set of '683 claim terms concerning a "sequence/list of routines." These terms require no construction. Lay jurors understand what "sequence" or "list" means, and further understand what "routines" means in the context of computer technology (namely, software routines). Nor do the parties dispute what those three words—sequence, list, routine—mean individually. There is no reason to construe these terms, except to say that they should be given their ordinary meaning. That is precisely what the Court did in its previous *Markman* Order concerning the '163 and '857 patents, finding that "sequence of components" means "sequence of software routines."

But F5 takes these readily understandable terms and tacks on twenty-three (23) additional words in its proposed construction (*i.e.*, "a sequence [list] of software routines that was not configured (i.e., the individual routines comprising the sequence were not identified) before the first packet of a message was received"). It attempts to justify this string of words in the 4-3 statement based on an alleged "disavowal of pre-configured paths." F5 is wrong for myriad reasons, including:

(1) F5 is transparently rewriting the '683 claims by improperly importing narrow claim limitations from the fundamentally different '163 and '857 claims, such as "**dynamically identifying**

---

[1] Exhibits 1-4 include: the '683 patent (Ex. 1); the '163 patent (Ex. 2); the '163 Reexamination Certificate (Ex. 3); and the '857 patent (Ex. 4). The '683, '163 and '857 patents share essentially the same specification. Most of the specification cites in this brief are to the '683 specification.

**a non-predefined** sequence of components" and "wherein **dynamically identifying includes selecting individual components to create the non-predefined** sequence of components **after the first packet** is received." The emphasized claim language is nowhere to be found in the '683 claims but represents the heart of F5's proposed construction;

(2) F5's proposed construction is inconsistent with and directly contradicts the '683 claim terms' plain language and ordinary meaning, as well as the context of the surrounding claim language;

(3) The subject matter that F5 attempts to exclude with its construction cannot be excluded as a matter of law because it is included in '683 dependent claims;

(4) F5's proposal improperly excludes a preferred embodiment in the specification;

(5) There is no disavowal as to the claim terms at issue, and even if there were, the disavowal is irrelevant to this claim construction exercise because the plain language of the '683 claims already excludes any allegedly disavowed subject matter (so no construction is required); and

(6) To the extent the Court finds it necessary to render a construction that includes further language capturing disavowed subject matter, F5's proposed construction is improper because it inaccurately states the excluded subject matter.

## II. Claim Construction Legal Standards

The scope of a patent is determined by its claims. 35 U.S.C. § 112, ¶ 2; *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). In determining a claim term's proper meaning, "[a] court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean,'" including "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

The components of the intrinsic evidence form a natural hierarchy of interpretive guides and outline a methodology in which the claims, the patent specification, and the prosecution history (to the extent it is in evidence) must all be reviewed. The claims form the first tier of the hierarchy and

1   can "provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at

2   1314-15. First, a term's context in the asserted claims can be very instructive. *Id.* Other asserted or

3   unasserted claims can also aid in determining the term's meaning. *Id.* Differences among the claim

4   terms can also assist in understanding a term's meaning. *Id.* For example, an independent claim must

5   be construed broadly enough to include the subject matter of its dependent claims. *Alcon Research,*

6   *Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012).

7       The remainder of the specification forms the second tier of the hierarchy. "[T]he specification

8   is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single

9   best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,

10  1582 (Fed. Cir. 1996). Finally, the third tier of intrinsic evidence is the prosecution history of the

11  patent. The prosecution history, however, "often lacks the clarity of the specification and thus is less

12  useful for claim construction purposes." *Phillips*, 415 F.3d at 1317. Importantly, although the

13  specification, prosecution history, and extrinsic evidence are available as tools to consider, "the claim

14  construction inquiry…begins and ends in all cases with the actual words of the claim." *Renishaw*

15  *PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (citations omitted).

16      Claim terms "are generally given their ordinary and customary meaning as understood by a

17  person of ordinary skill in the art when read in the context of the specification and prosecution

18  history." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing

19  *Phillips*, 415 F.3d at 1313); *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d

20  1357, 1370 (Fed. Cir. 2002) (noting that Federal Circuit places a "strong presumption in favor of the

21  ordinary meaning of claim language"). The only two exceptions to the "strong presumption" of

22  ordinary meaning are "1) when a patentee sets out a definition and acts as his own lexicographer, or

23  2) when the patentee disavows the full scope of a claim term either in the specification or during

24  prosecution." *Thorner*, 669 F.3d at 1365.

25      To narrow a term from its ordinary meaning, the disavowal must be "**<u>clear and</u>**

26  **<u>unmistakable</u>.**" *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1358 (Fed. Cir. 2003)

27  (emphasis added). The Federal Circuit has articulated this bedrock principle with increasing fervor,

28

requiring an "exacting" standard for claim disavowal[2]; finding that the disavowal must be unambiguous[3] and "unequivocal[]"[4]; and holding that "[t]here is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.'"[5]

Additionally, patent claims are rarely interpreted in a manner that would exclude the examples disclosed in the specification. *See Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *Vitronics*, 90 F.3d at 1583 (explaining that a construction that excludes the preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support").

### III. Overview of Technology Field and Pre-'683 Network Processing

#### A.      General Technical Background

The '683 patent relates to processing messages with packets. "A message is a collection of data that is related in some way, such as [a] stream of video or audio data or an email message." Ex. 1 at 2:49-51. Messages are fragmented into smaller pieces called "packets" for transport across a network. *Id.* at 2:42-44. Each message packet can include different layers in different data formats. *Id.* at 1:24-44. In essence, each layer in the packet serves as a container for the data embedded within it. These different layers are often associated with different layers of a network model that includes various protocols arranged in a network stack (*e.g.*, an Ethernet/physical layer, an IP/network layer, and a TCP/transport layer). *See, e.g.*, Ex. 5.

The following diagram illustrates these concepts; it shows a message with five packets, where each packet contains (1) a TCP layer with data in a TCP format nested within (2) an IP layer with data in an IP format nested within (3) an Ethernet layer with data in an Ethernet format:

---

[2] *Thorner*, 669 F.3d at 1366.

[3] *Grober v. Mako Prods., Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012), *reh'g denied* (Sept. 14, 2012).

[4] *Omega Eng'g., Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed.Cir.2003).

[5] *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012) (citing *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1297 (Fed. Cir. 2005)).



To process packetized messages with layers of data in different formats, computers use software routines for analyzing and processing the data at each layer and for converting the data into another format that is compatible with the next layer. For example, as shown in the above figure, software routines associated with an Ethernet protocol will process the packet first, as the outermost layer of the packet is in an Ethernet format. The processing of the packet by the Ethernet protocol software routines will result in a packet with an outermost layer that is in the IP format. Accordingly, the packet must then be processed by software routines associated with an IP protocol. The processing by the IP protocol software routines will result in a packet with an outermost layer in the TCP format. The packet must then be processed by software routines associated with a TCP protocol.

## B.    Mosberger's Scout System (Circa 1997)

In the early days of networking, there were a limited number of network applications (*e.g.* internet browsers, email, chat) and therefore a limited number of different packetized messages being transmitted and received between networked systems. Accordingly, "purpose-built network stacks"— with implemented processing paths compiled and built into the system itself—were developed for specific applications. The types of packets these appliances would send and receive were predictable; and because there were fewer variations of data types and protocols to consider, purpose-built stacks assumed how software routines for processing the different data should be connected. These built-in assumptions were manageable because of the limited number of possible processing paths (given the relatively small number of data types and protocols).

Under this design philosophy, the purpose-built stacks were only able to handle packets that matched the particular application. In this vein, David Mosberger's 1997 Ph.D. Dissertation, "Scout: A Path Based Operating System" ("Mosberger") described a system with "a modular structure that is complemented by a new abstraction called the path. The modular structure enables the **efficient**

**building of systems that are tailored precisely to the requirements of a particular appliance**.”
*See* Ex. 6 at 13 (emphasis added). In essence, Mosberger described a system that permitted modular development and deployment of tailored, purpose-built stacks for individual appliances. This modular structure permitted developers to reuse code modules (*e.g.*, for handling particular protocols) while still building an efficient, targeted system to run on the appliance device.

Mosberger was front and center in the first case, and it was considered by the PTO in both the '163 *ex parte* reexamination and the '683 patent prosecution. The Implicit PTO responses provide a detailed description of Mosberger. *See* Ex. 7 at 11-15 ('163 Reex); Ex. 8 at 11-12 ('163 Reex); Ex. 9 at 13-17 ('163 Reex); Ex. 10 at 9-12 ('683 prosecution). An abbreviated description is presented below.

The annotated figure below illustrates the three time periods relevant to Mosberger's path-based operating system called Scout. Ex. 6 at 60-61.



The first time period—implementation—is shown above the dotted line and occurs during "build time." The second time period—path creation—occurs during system initialization but before messages arrive. The final time period—path execution—occurs as messages arrive and are processed by the system. The above figure and the discussion below show that the Mosberger system creates paths before the messages arrive.

The first time period involves implementing the modules, path transformations, and module graph used in the system. During this stage the programmer and/or system designer determine the system's functionality. *Id.* at 60 ("[T]he desired functionality for a particular information appliance is

1   chosen by selecting the appropriate modules and connecting them into a module graph."). "Module

2   implementation," which includes writing the module code, determines the operation of the individual

3   modules. The "module graph" provides the specific "connections" between the implemented

4   modules. *Id.* at 65-67 (describing the graph file's syntax). This graph provides information about

5   paths that can be created during system initialization. Each module is an instance that is connected to

6   other module instances in the graph. *Id.* Once the implementation design is complete, the system is

7   ready to be compiled. *See id.* at 60 ("When all this is done, the system (kernel) is built.").

8        The second phase is path creation. Mosberger teaches that the "pathCreate" software function

9   creates paths. *See id.* at 80. The C-programming language prototype of "pathCreate" is "`Path`

10  `pathCreate (Module m, Attrs a);`". *See id.* "As the prototype suggests, a path is created

11  by invoking the function on a module `m` with an attribute set `a`." *Id.* The attributes, referred to as

12  invariants, describe the desired path. *See id.* The end result of invoking pathCreate is that Scout will

13  create a path. *See id.* at 81 ("At this point, the `pathCreate` function creates the actual path object,

14  inserts the stages into it, and establishes the various chains through the path structure.").

15       The final phase is path execution when the messages arrive. *See id.* at 61. Mosberger

16  describes how to select the appropriate path from amongst the finite set of **previously-created paths**

17  based on the contents of a particular message. *See id.* at 85-99. This point is underscored by the first

18  sentence in section 3.4: "So far, we have not discussed the issue of **how the appropriate path is**

19  **found for a given message**." *Id.* at 85 (emphasis added). Upon receipt of a message, Scout uses a

20  demultiplexing process to "find" the correct previously-created path to process the message. *See id.* at

21  85-86 (describing how Scout uses packet demultiplexing to "pick a path and start processing a

22  packet"). Once the appropriate path is found, the message data is placed in the path's input queue and

23  processed by the chosen path. *Id.* at 48 ("As defined so far, paths are simple and highly predictable: a

24  data-item arrives at the input queue, the path is scheduled for execution, and the transformed data is

25  deposited in the output queue.").

26       Thus, the Mosberger system is first built, or compiled, to include a particular set of module

27  implementations and a module graph that dictates the connections between each included module.

28  Then, the compiled system is run, and during initialization, paths are created (before any messages

IMPLICIT'S OPENING CLAIM      - 7 -      Case No. 3:14-cv-02856-SI
CONSTRUCTION BRIEF

1    are received) in accordance with the module graph. Later, when messages are received, they are

2    demultiplexed so that the appropriate previously-created path can be found for processing. Paths that

3    do not exist in the module graph cannot be used within the system without recompiling the system to

4    include the new path. Accordingly, every time a Mosberger system needed to handle a new data

5    format, the developer had to take the system off-line, write code for new modules, add the new

6    modules to the appropriate locations within a new module graph and describe their connections to

7    other modules within the graph, recompile and rebuild the entire system, and then put it back online.

8    But, to be clear, it was not a design goal in Mosberger to effectively rebuild the system in this manner

9    because the Mosberger purpose built appliances were designed for limited applications.

10   **IV. The '683 Invention as Disclosed in the Patent Specification**

11          In stark contrast to Mosberger, Implicit's '683 invention provides flexibility even after a

12   system has been deployed. Such flexibility is desirable given the explosion in networked applications

13   and communication devices, which resulted in a large number of new and ever changing protocols

14   and data formats for communicating between devices. *See* Ex. 1 at 1:54-57 (describing devices

15   receiving data "in many different formats that may not be known until the data is received."). Implicit

16   recognized that this proliferation of new formats and protocols meant that purpose-built appliances,

17   like Mosberger, could no longer process all of the data flowing through networks.

18          The specifications of the '683 and '211 (U.S. Patent No. 7,730,211, Ex. 11)[6] patents disclose

19   a preferred embodiment (i) that creates paths after the messages arrive (based on information in the

20   message packets), and (ii) that creates these paths by using not only "sequences of routines" that

21   come into existence *after* the messages are received (F5's limited construction), but also "sequences

22   of routines" that exist *before* the messages are received (what F5's construction excludes). This

23   preferred embodiment discloses a media cache 503 for storing an "address list" indicating sequences

24   of routines. Ex. 11 at 6:24-29, Fig. 5. During system initialization—*before any message packets are*

25   *received*—the preferred embodiment "primes the cache" by storing addresses for various sequences

26   of routines that have been identified. Ex. 11 at 3:34-35 ("[T]he system stores in a cache an indication

27   _____

28   [6] As stated in the previous *Markman* Order, the '683 specification incorporates by reference and thus
     includes the '211 specification. Ex. 1 at 3:62-67; Ex 12 at 2 n. 2.

IMPLICIT'S OPENING CLAIM              - 8 -              Case No. 3:14-cv-02856-SI
CONSTRUCTION BRIEF

of a sequence of routines that are to be invoked to effect the routing."); *see also id.* at 10:46-49, 11:1-3, 11:19-21, Fig. 15 (step 1505, "prime caches").

Annotated Figure 17 shows an exemplary primed media cache 1705 containing addresses for two sequences of routines:



*Id.* at Fig. 17 (annotated); Ex. 1 at 4:61-64 ("A 30 sequence…is defined by the address 'P1:1, P2:1, P3:2, P4:7.'"). As shown, the first address in the primed media cache indicates a sequence of four routines[7]: (1) "P1:1," the first protocol's first routine; (2) "P2:1," the second protocol's first routine; (3) "P3:2," the third protocol's second routine; and (4) "P4:1," the fourth protocol's first routine. *See* Ex. 11 at 11:32-34, Fig. 17. Similarly, the second address in the primed media cache indicates a sequence of five routines. *Id.* Importantly, these addresses and the corresponding sequences of routines that have been identified are stored *before the system receives any message packets*. *Id.* at 10:46-49, 11:1-3, 11:19-21, Fig. 15.

Later, after the system has been initialized and the cache has been primed, the preferred embodiment begins receiving message packets. Figure 1 of the '683 patent illustrates the general procedure for processing a message:



---

[7] The specifications use a convention to specify each routine in the sequence: the first entry, which precedes the colon, identifies the protocol by number (*e.g.*, "P1"), while the second entry, which follows the colon, identifies the particular routine within the protocol. *See* Ex. 1 at 4:61-5:2, 6:53-54.

1  Ex. 1 at 4:1-2, Fig. 1. First, Driver 101 receives the message packets from a network. *Id.* at 4:2-3.

2  After receiving a packet, the system then calls Message Send module 102 (*see* '683 Figures 7A-B for

3  detail), Demux module 103 (*see* '683 Figures 8-16 for

4  detail), and Label Map Get module 104. *Id.* at 4:3-17.

5  Annotated '211 Figure 8 (right) illustrates the

6  Label Map Get module (referred to in the '211 patent as

7  the "Media[8] Map Get" module). Ex. 11 Fig. 8. First, the

8  Label Map Get module checks the media cache, which as

9  discussed above has already been primed during system

10  initialization with addresses for various sequences of

11  routines. *Id.* at 7:44-46, Fig. 8 (box 1). If the primed media

12  cache contains an address for a pre-existing sequence of

13  routines that can be used to process the message, then the

14  label map get module exits and returns the address for that

15  pre-existing sequence to the Demux module 103. *Id.* at

16  7:46-50, 8:15-29, Fig. 8 (boxes 1-2), 6:37-40, 6:61-66; Ex.

17  1 at 10:58-60. But if none of the addresses of the pre-

18  existing sequences of routines in the primed media cache

19  can be used to process the message, then the Label Map

20  Get module invokes the Search Edge Space module to

21  search for other routines that can be sequenced to process

22  the message. Ex. 11 at 7:61-67, 9:4-59, Fig. 8 (boxes 5-6),

23  7:10-16. That Search Edge Space module searches for suitable routines that can be sequenced by

24  comparing the media type of the routines with the media type of the packet. *Id.* at 9:4-59. If a suitable

25  sequence of routines is determined, the Label Map Get module exits and returns the address

26  corresponding to that sequence of routines to the Demux module. *Id.*

27  _____

28  [8] As stated in the previous *Markman* Order, the Implicit specifications use the terms "media" and "label" interchangeably. Ex. 1 at 6:29-31; Ex. 12 at 9.



Uses pre-existing "sequence of routines"

Does **not** use pre-existing "sequence of routines"

1    At this point, the Demux module uses the address returned by the Label Map Get module
2   (either from the primed cache or search edge space) to select the sequence of routines indicated by
3   the address and create the path. Ex. 1 at 10:58-14:3 (especially the Create Path function 1513). Thus,
4   the '683 specification describes "sequence of routines" broadly in accordance with its ordinary
5   meaning, and the preferred embodiment uses sequences of routines that exist *both before and after*
6   message packets are received. In either case, the '683 patent relies on a mechanism to return a
7   sequence of routines for a given type of message. This allows the '683 system to be reconfigured
8   after it starts receiving messages by changing the mapping of messages to routines through Label
9   Map Get. For example, if the system administrator wants to handle incoming HTTP traffic through a
10  different set of routines, the relevant modules do not need to be recompiled. Instead, the administrator
11  simply redefines the addresses associated with the given data type. Then, when a new packet comes
12  in and '683 calls Label Map Get, the new sequence of routines will be returned. This is an inherent
13  benefit of having an address that indicates how modules should be interconnected when the message
14  arrives rather than implementing the system pre-message (ala Mosberger) by connecting those
15  modules together using a compiler (*i.e.*, at build time). The '683 invention, therefore, avoids the
16  arduous Mosberger process described above of taking the system off-line, modifying the code,
17  recompiling, and redeploying the modified version of the system to handle new data.

18  **V.  "Sequence/List of Routines" Should Be Given Their Ordinary Meaning**

| Claim Term | Implicit's Proposal | F5's Proposal |
|---|---|---|
| "sequence of routines"<br><br>Claims 1, 4, 5, 6, 8, 9, 24, 28, 30<br><br>"list of routines"<br><br>Claim 16 | No construction necessary; ordinary and customary meaning applies.<br><br>Alternative: "an ordered arrangement of software routines" | "a sequence [list] of software routines that was not configured (i.e., the individual routines comprising the sequence were not identified) before the first packet of a message was received" |
| "list of conversion routines"<br><br>Claim 10 | No construction necessary; ordinary and customary meaning applies.<br><br>Alternative: "an ordered arrangement of software routines for changing data | "a list of software routines that was not configured (i.e., the individual routines comprising the sequence were not identified) before the first packet of a message was received" |

| | from one format to another" | |
|---|---|---|

Because each word in the three terms at issue (*i.e.*, list, sequence, and routines) are understandable to a juror and because there is no intrinsic evidence that militates against the plain meanings, no construction is necessary. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (finding "'plain and ordinary meaning'" because "[i]n this situation, the district court was not obligated to provide additional guidance to the jury"); *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in non-construction of "melting"); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction "is not an obligatory exercise in redundancy" in which a court must merely substitute synonyms for claim words). As shown below, the ordinary meaning is consistent with the plain claim language, the claim context, the preferred embodiment, and the prosecution histories. On the other hand, F5's proposal directly contradicts the claim language and context, while also excluding the preferred embodiment. Nor does the alleged disavowal that was *unsuccessfully attempted* in connection with the very different '163/'857 claims have any relevance here. At the end of the day, F5's proposed construction is a transparent attempt to rewrite the '683 claims to include narrow limitations from the '163/'857 claims—this should be rejected.

### A. The Plain Language of the Independent Claims and Claim Context Support the Ordinary Meaning

The '683 independent claims cover the concept of "creat[ing]" a "data structure" or a "path that includes one or more data structures" based on information obtained from a message packet, *i.e.*, the path or data structure is created *after* a message arrives. Ex. 1 Claims 1, 10 (creating a path including data structures) and Claims 16, 24 (creating data structures). The post-message created path/data structure is then "stored"; at that point, it is instantiated and ready to process the packets of the message. *Id.* '683 independent claims 1 and 10 are illustrative:

> 1.    A first apparatus for receiving data from a second apparatus, the first apparatus comprising:
>           a processing unit; and
>           a memory storing instructions executable by the processing unit to:
>           create, based on an identification of information in a received packet of a message, a path that includes one or more data structures that indicate a **sequence of routines** for processing packets in the message;

store the created path; and…

10.    A non-transitory, computer-readable medium comprising software instructions for processing a message, wherein the software instructions, when executed, cause a computer system to:

obtain information from a particular packet of the message, wherein the particular packet has been received by the computer system;

use the obtained information to identify an address specifying a **list of conversion routines**;

create a path that includes one or more data structures that specify a sequence of sessions, wherein sessions in the sequence correspond to respective ones of the **conversion routines in the list**;

store the created path; and...

Ex. 1 at 14:20-35, 15:3-24 (emphasis added).

These and the other independent claims use sequence/list of routines in their ordinary way, and there is no claim language that suggests the meaning should be limited. Notice that there is no qualifier (such as non-preconfigured) in front of sequence or list. Claim 1 simply states that the data structures "indicate a sequence of routines." Claim 10 states that the message information is used to "identify an address specifying a list of conversion routines." As such, the path data structure of claim 10 is created, in part, by identify[ing] an address. *See also* claim 16 (covering the concept of identifying an address that "references" a list of routines).

 Notwithstanding the broad claim language and in a blatant attempt to exclude configuration information, F5's construction requires that the sequence/list of routines "was not configured (i.e., the individual routines comprising the sequence were not identified) before the first packet of a message was received." F5's proposed requirements first introduce the concept of *configuring* and then dictate *when a sequence or list can be configured*, while also providing an unsupported definition ("i.e.") for "configured." None of this is supported by the language or context of the claims.

First, none of the claims mentions "configuring" a sequence/list or "identifying" the individual routines in a sequence/list. The only reference to "configure" within the claims is in claim 16: "A first apparatus configured to receive data from a second apparatus…." Ex. 1 at 15:42-43. This has no relation to configuring a sequence/list. Further, the only references to "identifying" in the claims involve the identification of information within a packet or the identification of an address. *See, e.g.*, Ex. 1 at 14:25-26 ("identification of information in a received packet"); *id.* at 14:61-62

("identify an address associated with the information"); *id.* at 15:10-11 ("identify an address specifying a list of conversion routines"); *id.* at 15:37-38 ("identify the address"). Thus, even a cursory read of the claims reveals that F5 is using words in its construction—*i.e.*, configured and identified—that have no support within the language of the claims or their context.

Further, even assuming that "configuring" should be part of the construction, the '683 independent claims do not specify *when* a sequence of routines is configured. For instance, claim 1 recites "one or more data structures that indicate a sequence of routines for processing packets." Ex. 1 at 14:26-28. The claim does not mention when the sequence was "configured," nor does it mention when the individual routines comprising the sequence were "identified." Similarly, claim 10 requires "an address specifying a list of conversion routines." Ex. 1 at 15:10-11. It does not, however, dictate when this list was configured or when the routines were identified. Likewise, in claim 16 ("the address references a list of routines"), *id.* at 15:49-50, and claim 24 ("one or more data structures that reference a sequence of routines"), *id.* at 16:31-32, there is no requirement concerning configuration or the timing of sequence/list configuration or the identification of individual routines.

Finally, F5's proposal improperly includes "the first packet of a message." But the claims recite (i) "identification of information in a *received packet* of a message" (claim 1); (ii) "obtain information from a *particular packet* of the message" (claim 10); and (iii) "obtain and analyze information from a *received packet* of a message" (claim 16) (emphases added). F5's proposal incorporates a "first packet" limitation that is narrower than this "received packet" or "particular packet" claim language.

In sum, neither the claim language nor the context provides any support for F5's additional limitations, which should be rejected in favor of the ordinary meaning. While no construction is necessary, Implicit's alternative language regarding "an ordered arrangement" is supported by the ordinary definitions for sequence and list. *See* Ex. 13 (defining sequence); Ex. 14 (defining list). And the parties agree that "routines" are "software routines." Finally, F5 appears to inadvertently leave out claim 10's "conversion" language, but that word needs no construction either. Alternatively, "conversion routines" are "software routines for changing data from one format to another." *See* Ex. 14 (defining conversion); *see also* Ex. 1 at 1:24-2:11 (describing conversion).

## B.     The Plain Language of the Dependent Claims Supports the Ordinary Meaning

Several '683 dependent claims further illustrate the claim breadth and directly refute F5's proposed construction. '683 claims 8 and 9, which are fatal to F5's proposed construction, provide:

8.      The first apparatus of claim **1,** wherein the memory stores instructions executable by the processing unit to identify an address associated with the information, wherein the **address indicates the routines in the sequence of routines** of the created path.

9.      The first apparatus of claim **8,** wherein the memory stores instructions executable by the processing unit to **use the address to select the sequence of routines from a plurality of sequences of routines that are stored** by the first apparatus **prior to receiving the packet** of the message.

Ex. 1 at 14:60-15:2.

Claim 8, which depends from claim 1, requires that the identified address "indicates the routines in the sequence of routines." Claim 9, which depends from claim 8, further requires that the address is used to select the sequence "from a plurality of sequences of routines that are stored" before the message packet is received. Thus, claim 9 explicitly covers sequences of routines that exist and are stored in the system *before* receiving the message. As a matter of law, claim 1 and its term "sequence of routines" must include this concept. *Alcon Research*, 687 F.3d at 1367 ("It is axiomatic that a dependent claim cannot be broader than the claim from which it depends."); *Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."); *Intamin, Ltd. v. Magnetar Techs., Corp.*, 483 F.3d 1328, 1335 (Fed. Cir. 2007) ("An independent claim impliedly embraces more subject matter than its narrower dependent claim."); 35 U.S.C. ¶ 112(d). This defeats F5's proposed construction, which attempts to use language preventing configuration and identification of individual routines before receiving or processing the message in a way that excludes claim 9's pre-existing sequences of routines.

Importantly, '683 claim 9 covers the preferred embodiment discussed above in Section IV. As part of priming the cache, the system stores in media cache 1705 the claimed "plurality of sequences of routines … prior to receiving the packet of the message." *See* Ex. 11 at 3:34-35; 10:46-49, 11:1-3, 11:19-21, Fig. 15. Each sequence of routines in media cache 1705 has an associated "address [that] indicates the routines in the sequence of routines," as claimed. *Id.* Later, when a message packet is

1   received, the preferred embodiment uses the claimed "information in a received packet of a message"

2   to identify one of those addresses and then to "select the sequence of routines" from the primed

3   media cache 1705. *Id.* at 7:46-50, 8:15-29, Fig. 8. (boxes 1-2), 6:37-40, 6:61-66.

4       **C.**    **The '683 Claims Do Not Include the '163/'857 Claim Limitations**

5       Another glaring problem with F5's proposed construction is the unwarranted importation of

6   limitations from the old '163/'857 claims asserted in the first case. But this is a new patent with

7   fundamentally different claim language. A brief description will illustrate these differences. '163

8   claim 1 is representative of the '163/'857 claims:

9       1.    A method in a computer system for processing a message having a sequence of packets, the method comprising:

10      providing a plurality of components, each component being a software routine for converting data with an input format into data with an output format;

11      for the first packet of the message,

12      *dynamically* identifying a *non-predefined* sequence of components for processing the packets of the message such that the output format of the components

13  of the *non-predefined* sequence match the input format of the next component in the *non-predefined* sequence,

14      *wherein dynamically identifying includes selecting individual components to*

15  *create the non-predefined sequence of components after the first packet is received;....*

16  Ex. 3 at 1:24-39. The narrowing claim language in italics—which was where the primary disputes

17  were centered in the first case—was added during the '163 *ex parte* reexamination.

18      One hallmark of these '163/'857 claims is the concept of "dynamically identifying a non-

19  predefined sequence of components."[9] Moreover, they expressly require a particular type of

20  dynamically identifying with two characteristics. First, as part of the dynamic identification process,

21  the '163/'857 claims require "selecting individual components to create the non-predefined sequence

22  of components after the first packet." In other words, post-first packet, each software routine must be

23  individually identified and selected so that the sequence of components can then be "created" one

24  component at a time. Second, they require matching the output format of a component in the

25  

26  _____

27  [9] All asserted claims of the '163/'857 patents included a version of the "dynamically identifying a sequence of components" limitation. Additionally, the asserted '163 claims included the "non-

28  predefined" language, which was effectively written into all asserted '163/'857 claims by the "wherein" clause: "wherein dynamically identifying includes selecting individual components to

sequence with the input format of the next component.

Now, consider F5's proposed construction. The first part—"sequence…that was not configured" before the first packet—imports the "non-predefined" (a.k.a. non-preconfigured) language from the '163 claims. The second part—"(i.e., the individual routines comprising the sequence were not identified)" before the first packet—imports the '163/'857 claim terms' requirement that each software routine must be individually identified and selected after the first packet. Yet none of the '163/'857 claim requirements discussed above are found in the '683 claims; there is no '683 claim language about (i) identifying a sequence of components (dynamic or not), (ii) whether the sequence is non-predefined, (iii) selecting individual components to create the sequence, or (iv) matching outputs/inputs of adjacent components.

Given the very different claim language, the Court should reject F5's attempt to rewrite the '683 claims in a way that limits them to the narrow '163/'857 claim requirements. The bottom line is that the differences in these claims represent two very different ways to distinguish Mosberger and other prior art. The fact that Implicit chose one way with a particular set of language in the '163 and '857 claims does not mean that there is no other way to distinguish the prior art or that the particular '163/'857 claim language can be imported into the '683 claims. To do so would be error.

### D.    The Specification Supports the Ordinary Meaning

As explained above in Section IV, the '683 specification discloses a preferred embodiment (i) that creates paths after the messages arrive (based on information in the message packets), and (ii) that creates these paths by using not only "sequences of routines" that come into existence *after* the messages are received (F5's limited construction), but also "sequences of routines" that exist *before* the messages are received (what F5's construction attempts to exclude). All of the '683 claims are broad enough, based on their plain language, to cover the pre-existing sequences in the preferred embodiment. Yet F5's construction is intended to exclude the use of sequences of routines in the primed media cache 1705—sequences that existed before any message packets are received.

Because F5's narrow construction excludes the preferred embodiment disclosed in the specification, it is legally improper. *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1379 (Fed. Cir.

---

create the sequence of components after the first packet is received."

2014) ("A construction that would exclude the preferred embodiment 'is rarely, if ever, correct and would require highly persuasive evidentiary support.'" (quoting *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1583 (Fed. Cir. 1996))); *Verizon Servs.*, 503 F.3d at 1305.

**E.     The '683 Prosecution History Supports the Ordinary Meaning**

In Exhibit A to the 4-3 statement, F5 cites Implicit's "Preliminary Amendment" in the '683 prosecution history. *See* Ex. 15 at 9-14. But that PTO filing does not contain the alleged disavowal. In fact, it does not even attempt to use the claim term at issue to distinguish Mosberger.

The Preliminary Amendment introduces new claims 26-55, which ultimately issued as '683 claims 1-30 after a few clarifying amendments. *See* Ex. 10 at 3-7. The "Remarks" section references the prior '163 *ex parte* reexamination and notes that "Patent Owner amended the ['163] claims to distinguish over Mosberger." *Id.* at 8. It also mentions the '163 and '857 *inter partes* reexaminations, which focused on the Decasper reference. *Id.* Implicit further stated that it was submitting for the PTO's consideration all of the prior art references and invalidity theories that Juniper and F5 relied on in the first case. *Id.* Accordingly, the PTO allowed the '683 claims after considering the prior art evidence and invalidity theories Juniper and F5 previously advanced.

Given the prominent role Mosberger played in the prior case and the '163 *ex parte* reexamination, Implicit devotes four pages in the Preliminary Amendment to discussing and distinguishing Mosberger. *Id.* at 9-12. As it had done before in the '163 *ex parte* reexamination, Implicit explains the relevant sections of Mosberger that establish how the Scout system creates paths "before the message was received." *Id.* "Thus, Mosberger does not teach or suggest [the claimed] 'instructions executable by [a] processing unit to: <u>create, based on an identification of information in a packet of a message, a path</u> that includes a sequence of routines for processing packets in the message'…." *Id.* at 12 (underlining original). Mosberger was never subsequently discussed in the '683 prosecution history; nor was it ever used by the PTO to reject the new claims.

Against this backdrop, several conclusions can be drawn from the Preliminary Amendment. First, the claim language that Implicit emphasized concerns path creation based on information in a message packet, not the claimed "sequence of routines." Second, based on this claim language, Mosberger was distinguished on the ground that it discloses a system that creates paths "before" the

1   message, *i.e.*, paths that, by definition, cannot be based on information in a message packet.

2          Third, because the plain language and ordinary meaning of the '683 claims already excludes

3   any allegedly disavowed subject matter (namely, "pre-configured paths"), there can be no disavowal.

4   Instead, Implicit was simply distinguishing Mosberger based on the express claim language. In

5   contrast, disavowals arise when some or all of the full scope of a claim term's ordinary meaning is

6   disavowed. But the pre-message paths of Mosberger clearly are not within the scope of the '683

7   claim language. Moreover, there is nothing in this file wrapper that rises to a "clear and

8   unmistakable" disavowal as required by the law.

9          Additionally, in a later Response that tweaked some of the '683 claim language, Implicit

10  expressly states that the claim terms concerning "path" and "data structure" should be given broad

11  meanings and are not limited to any specific specification embodiments. Ex. 16 at 11. Implicit also

12  made clear that the words "indicate," "specify," and "reference" (*e.g.*, in "a path that includes one or

13  more data structures that indicate a sequence of routines") "are to be interpreted broadly" and

14  expressly cover examples like using a pointer or an index in a look up table. These statements by

15  Implicit further support a broad ordinary meaning and show that Implicit expressly told the PTO that

16  the claims cover the configuration information that F5 attempts to exclude.

17         For these reasons, nothing in the '683 prosecution history supports F5's construction. Instead,

18  that prosecution history simply reaffirms that the '683 claims are drawn to creating paths or data

19  structures based on information in a message packet, as opposed to creating a path before and

20  independent of the message, as in Mosberger.

21  **F.      The Pre-'683 Prosecution Histories Do Not Change the Ordinary Meaning**

22         F5's portion of the joint 4-3 statement includes over 30 pages of cites to the various '163 and

23  '857 reexamination prosecution histories to support the alleged disavowal of "pre-configured paths."

24  Ex. 15 at 16-50. As a preliminary matter, this admonishment from the Federal Circuit must be

25  heeded: "Our cases also warn that, because the prosecution history represents an ongoing negotiation

26  between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less

27  useful for claim construction purposes.'" *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d

28  1315, 1326 (Fed. Cir. 2013) (quoting *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1401 (Fed. Cir.

1    2008)). Additionally, while a point by point rebuttal is neither practical nor necessary, Implicit

2    provides the following brief chronology of those prosecution histories to show their lack of relevance

3    for the following reasons: (i) the alleged disavowal was rejected by the PTO, which put the public on

4    notice that there was no disavowed subject matter; (ii) the alleged disavowal was directed to—and

5    limited to—the very different '163 claim language; and (iii) even if there were a disavowal of "pre-

6    configured paths," the disavowal is irrelevant to this claim construction exercise because the '683's

7    plain claim language already excludes any disavowed subject matter (so no construction is required).

8            In the past, F5 has relied heavily on Implicit's first response in the '163 *ex parte*

9    reexamination. *See* Ex. 7. But that response was focused on very different claim language compared

10   to the '683 claims, namely, the original '163 "identifying components" limitations set forth on page

11   16. *Id.* at 16. Again, there is nothing in the '683 claims about *identifying* a sequence of

12   routines/components, much less the specific dynamic identification process required by the '163

13   narrowing amendments. In the context of those original '163 claims and with an emphasis on the

14   identifying components limitations, Implicit *attempted to* "disavow[ ] prior art systems (like

15   Mosberger) that use pre-configured paths…." *Id.* at 18. Implicit cited column 1, lines 41-43 of the

16   '163 specification that states prior art "computer systems typically use predefined configuration

17   information to load the correct combination of conversion routines," and expressly stated that this

18   passage "describes the Mosberger [pre-configured path] system." *Id.* Importantly, Implicit also made

19   clear in its response that it was *not* disavowing the concept of using configuration information that

20   exists before the message to identify the sequence and create the path data structure. *Id.* at 19

21   (referring to label map get—explained *supra* at Section IV).

22           In the next office action, the PTO rejected both the original '163 claims and Implicit's

23   attempted disavowal, stating that "the language of the claim[s] does not specify that the identified

24   sequence of components cannot be predetermined…. This process is not recited as being dynamic in

25   nature." Ex. 17 at 14 (addressing claim 1), 15 (addressing claims 15 and 35, erroneously labeled as 16

26   and 36) ("the limitations of the claim do not preclude the use of a predefined pathway"). Thus, the

27   PTO found that the reference in column 1 of the '163 patent to Mosberger-like systems with

28   "predefined pathway[s]" and the statements by Implicit in the response did not rise to the level of a

1   clear and unmistakable disavowal in the context of the original '163 claim language. In effect, the

2   PTO was saying that Implicit would have to narrow its claim language because there is no disavowal.

3          Moreover, the PTO expressly found that the original '163 claim limitation "identifying a

4   sequence of components" has a broad meaning that is not limited to non-preconfigured or non-

5   predefined sequences. (By definition, therefore, the PTO necessarily found that "sequence of

6   components" has a broad meaning.) There is no further discussion in the remaining parts of the '163

7   *ex parte* reexamination prosecution history about potential "disclaimers/disavowals" narrowing the

8   claim language; instead, the focus afterwards is on altering the claim language itself.

9          Because the PTO found that there was no clear and unmistakable disavowal, in its next

10  response, Implicit added the previously litigated claim language regarding "dynamically" identifying

11  and "wherein dynamically identifying includes selecting individual components to form the sequence

12  of components after the first packet is received." Ex. 8 at 3-8. The PTO still rejected those claims

13  notwithstanding the narrowing amendments. *See* Ex. 18. Implicit then added the previously litigated

14  requirement that the sequence of components be "non-predefined." Ex. 9 at 2-7. In light of all of

15  these narrowing amendments (none of which appear in the '683 claims), Implicit was able to

16  distinguish Mosberger's paths that are created before the message, as follows:

17          [ ] Mosberger teaches that there are three key "epochs" or time periods during the
        development and operation of the Scout path-based operating system. (Mosberger, pp.
18          60-61). The first is "build time," when the programmer designs the individual
        modules, decides what kinds of paths are likely to be important to system
19          performance, develops the module graph and builds the system kernel (*Id.*). The
        second time period is "path creation," which occurs at "runtime" during system
20          initialization when the system creates all the possible paths. (*Id.*; Mosberger, pp. 80-
        82). At this point, the **paths have been created or defined**. The third and final time
21          period is "path execution," which also occurs at "runtime" (but after "path creation")
        when the system receives messages, chooses which of the **predefined paths** is
22          appropriate for a particular message and then executes the modules in that **predefined**
23          **path**. (Mosberger, pp. 60-61, 85, 100-101).
24

25  *Id.* at 13-14 (emphasis added); *see generally id.* at 12-17. The narrowed claims were then deemed

26  patentable based on their claim language, *not based on any disavowal*. Ex. 19.

27          The '163 *inter partes* reexamination also has no impact on the '683 terms at issue. Again, this

28  later reexamination was focused on the narrow '163 claims that have multiple requirements not

---

IMPLICIT'S OPENING CLAIM          - 21 -          Case No. 3:14-cv-02856-SI
CONSTRUCTION BRIEF

present in the '683 claims. At the same time, Implicit again made clear what Mosberger teaches and by extension column 1 of the '163 patent (namely, fully "implemented" pre-message paths):

> Most purpose built systems addressed this problem by preconfiguring each possible sequence of components (referred to as "paths" or processing paths) in the **implementation** of the system. '163 patent at 1:41-43 ("These computer systems typically use predefined configuration information to load the correct combination of conversion routines for processing data"). For example, in [Scout], modules were connected in a router graph, which was used by a compiler to connect modules in all the possible ways that they would be used. This type of predefined configuration of the processing software routines was **implemented** by the system and unchangeable.

Ex. 20 at 5 (citations omitted); *see also* Ex. 21 at 7 ("Unlike previous methodologies—which had fixed network stacks in a predefined order based on implementation (*see, e.g.*, Scout)—the '857 specification discloses a system that uses ["pre-existing"] configuration information after the first packet is received to determine how to dynamically construct a processing path.").

Against this backdrop, several conclusions can be drawn from the pre-'683 prosecution histories. First, the PTO rejected the alleged disavowal stemming from column 1 of the specification and Implicit's statements. This indisputable rejection put the public and those of ordinary skill on notice that there was no disavowed subject matter; disavowals must be "clear and unmistakable." Second, because the PTO found that the original '163 claim limitation "identifying a sequence of components" has a broad meaning that was not limited to non-preconfigured or non-predefined sequences, it also necessarily found that "sequence of components" has a broad meaning. This would be evident to a person of ordinary skill reading the prosecution history. Third, as stated above, prosecution histories are "less useful" because they represent on "ongoing negotiation." This warning from the Federal Circuit is especially critical here because Implicit repeatedly narrowed the '163 claim language throughout the reexamination prosecution. Those narrowing amendments, in the context of this "negotiation," necessarily rendered any alleged disavowal irrelevant—even to the narrowed '163 claims—because they expressly excluded the subject matter of Mosberger.

Fourth, because the alleged disavowal was made in the context of the very different '163 claim language, it can have no impact, as a matter of law, on the '683 claims that omit the relevant '163 limitations. This is borne out by well-settled law. *See, e.g.*, *Saunders Grp., Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific

claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply.") (quotations omitted); *Ventana Med. Sys. v. Biogenex Labs.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("[T]he doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language."); *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1078 (Fed. Cir. 2005) ("[T]he prosecution of one claim term in a parent application will generally not limit different claim language in a continuation application."); *Advanced Cardiovascular Sys. v. Medtronic, Inc.*, 265 F.3d 1294, 1305-06 (Fed. Cir. 2001) (finding that prosecution history for parent patent could not disavow scope of child patent where patentee filed child patent with different claim terms to secure broader claims).

Finally, even if there were a disavowal of "pre-configured paths," the disavowal is irrelevant to this claim construction exercise because the ordinary meaning of the '683 claims already excludes any disavowed subject matter. As explained above, the '683 claims on their face distinguish over and exclude paths that are created before the message arrives. Implicit was free to choose that clear language to distinguish over the allegedly disavowed subject matter in column 1 and Mosberger; its clarity speaks volumes and needs no construction.

## VI. F5 Has Mischaracterized the Alleged Disavowal in Its Proposed Construction

To the extent the Court finds it necessary to render a construction that includes further language capturing the allegedly disavowed subject matter, F5's proposed construction is improper because it inaccurately states the excluded subject matter. The alleged disavowal concerns "pre-configured paths," instead of "a sequence of software routines that was not configured (i.e., the individual routines comprising the sequence were not identified) before the first packet of a message was received." As shown above, F5's construction is a transparent attempt to import the narrow limitations of the '163/'857 claims. The result F5 hopes to accomplish with its improper construction is to exclude any systems that use configuration information about sequences that exists before the messages arrive. F5's strategy is blatantly obvious and should be rejected for all of the above reasons.

Moreover, Mosberger's paths are "preconfigured" in the sense that the paths that include a sequence of routines cannot be modified or changed once the system has been implemented, built, and deployed. As explained earlier (Section III.B), the sequence of routines in Mosberger is defined

and implemented in code that is compiled into the software system before messages arrive. Thus, modifying paths in Mosberger requires taking the system off-line, writing code for new modules, adding the new modules to the module graph and defining their connections to other modules within the graph, recompiling the system, and redeploying the new version of the system, which only now includes the new or modified paths, for operation.

Any alleged disavowal that is written into the construction must, at least, include all of these features. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157, 1177 (Fed. Cir. 2008) ("[E]ven in the case of an unequivocal disavowal of claim scope, the court must construe the claim congruent with the scope of the surrender.") (citations and quotation marks omitted).

## VII.   The Orders From the First F5 Case Do Not Change the Ordinary Meaning

F5 also cites to the previous *Markman* and Summary Judgment Orders in the joint 4-3 statement. As the above discussion makes clear, those Orders were decided in the context of very different claim language. Thus, these Orders must be viewed through that lens.

The above notwithstanding, several interesting data points can be gleaned from the previous Orders. First, with respect to the '163 claim term "non-predefined sequence of components," the *Markman* Order makes clear that the phrase "sequence of components" should be given the broad meaning of "sequence of software routines" (because "components" means "software routine"). Ex. 12 at 5-6. By extension, the '683 claim term "sequence of routines" should also be given its broad ordinary meaning or "sequence of software routines," as Implicit has proposed.

To put a finer point on this, the Court stated that the "more difficult question is the definition for **non-predefined**," which was "introduced in order to distinguish '163 from the Mosberger prior art." But, as shown above, this limiting phrase is not used in the '683 claims because Implicit chose other ways to distinguish Mosberger. F5's proposed construction here is simply an attempt to pretend the "non-predefined" language is still in the claims.

Moreover, in addressing the meaning of "non-predefined," the Court rejected F5's proposed construction of "a sequence of conversion routines that was not identified in or determinable from configuration information in place before the first packet of a message was received." Ex. 12 at 5-6. The Court stated that "Implicit did not disclaim [in the '163 *ex parte* reexamination] the ability to

1   create a sequence of conversion routines by relying in some part on predefined 'configuration

2   information,' but only the use of pre-configured paths." *Id.* at 6. Yet F5's proposed construction here

3   relies heavily on carving out pre-existing configuration information: "a sequence of software routines

4   **that was not configured**…**before the first packet**." Again, F5's clear strategy is to exclude any

5   systems that use configuration information about sequences that exists before the messages arrive.

6         With respect to the summary judgment Order (cited by F5 at pages 54-66 of the 4-3

7   statement), the Court reaffirmed that "in the initial '163 Reexam, Implicit did not disclaim the ability

8   to rely in 'some part' on predefined 'configuration information' to identify the non-predefined

9   sequence…." Ex. 22 at 26; *id.* at 27 ("It is true that Implicit did not disavow using pre-configured

10  processing information 'in some part.'"). Importantly and presciently, the Court also underscored one

11  of the fundamental differences in the '683 claims that cover the creation of instantiated, post-message

12  paths versus the '163/'857 claims that cover dynamically identifying and selecting individual

13  components one at a time to create the sequence of routines: "Implicit attempts to add a [claim]

14  requirement—that the method not only identify the sequence of components to be used to process a

15  particular type of message/flow but also to 'create' an actual, 'stateful' path in memory…. [B]ut the

16  identification and selection of the individual components to form the processing sequence is what is

17  required by the ['163/'857] claim language." *Id.* at 26.

18  **VIII.   Conclusion**

19        For all the above reasons, no construction of "sequence/list of routines" is required.

20

21

22

23

24

25

26

27

28

1

2 Dated:  February 2, 2015.                By: */s/ Leslie V. Payne*_____
                                          Leslie V. Payne
3                                         TX Bar No. 00784736 (Admitted *Pro Hac Vice*)
                                          lpayne@hpcllp.com
4                                         Eric J. Enger
5                                         TX Bar No. 24045833 (Admitted *Pro Hac Vice*)
                                          eenger@hpcllp.com
6                                         Allan Bullwinkel
7                                         TX Bar No. 24064327 (Admitted *Pro Hac Vice*)
                                          abullwinkel@hpcllp.com
8                                         HEIM, PAYNE & CHORUSH, LLP
9                                         600 Travis Street, Suite 6710
                                          Houston, Texas 77002-2912
10                                        T: (713) 221-2000
                                          F: (713) 221-2021
11

12                                        Brooke A. M. Taylor
                                          WA Bar No. 33190 (Admitted *Pro Hac Vice*)
13                                        btaylor@susmangodfrey.com
                                          Jordan W. Connors
14                                        WA Bar No. 41649 (Admitted *Pro Hac Vice*)
15                                        jconnors@susmangodfrey.com
                                          SUSMAN GODFREY L.L.P.
16                                        1201 Third Avenue, Suite 3800
                                          Seattle, Washington 98101-3000
17                                        T: (206) 516-3880
                                          F: (206) 516-3883
18

19                                        ATTORNEYS FOR IMPLICIT L.L.C.

20

21

22

23

24

25

26

27

28

---

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of February, 2015, a true and correct copy of the foregoing document was served on all parties via email.

/s/ Leslie V. Payne

Leslie V. Payne