MICHAEL J. BETTINGER (SBN 122196)
HOLLY HOGAN (SBN 238714)
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: 415.882.8200
Facsimile: 415.882.8220
mike.bettinger@klgates.com
holly.hogan@klgates.com

SHANE BRUN (SBN 179079)
**GOODWIN PROCTER LLP**
Three Embarcadero Center, 24th Floor
San Francisco, California 94111
Telephone:  415.733.6000
Facsimile:  415.677.9041
sbrun@goodwinprocter.com

Attorneys for Defendant
F5 NETWORKS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IMPLICIT L.L.C., | Case No. 3:14-cv-02856-SI |
| Plaintiff, | **F5 NETWORKS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| F5 NETWORKS, INC., | |
| Defendant. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................. 2

    A.    The '683 Patent Was Born From the Previously Litigated '163 and '857 Patents ...................................................................................................2

    B.    Implicit's Alleged Invention Requires "On the Fly" Identification of Each Component in a Processing Sequence, After Data Hits the System .............................3

III.  CLAIM CONSTRUCTION ................................................................ 6

IV.  LEGAL ARGUMENT ........................................................................ 7

    A.    The Sequences of Routines in the '683 Patent Cannot Be Preconfigured ...................7

    B.    Implicit's Proposed Construction Ignores Its Own Disavowal of Preconfigured Paths ....................................................................................................10

        1.    Implicit Seeks to Renege on Its Disavowal of Preconfigured Paths ................10

        2.    Implicit's Disavowal of Preconfigured Sequences of Routines Goes to the Heart of Its Invention, and Therefore Bounds the '683 Claims ......................12

        3.    The '683 Patent's Use of the Word "Path" Does Not Negate Implicit's Disavowal of Preconfigured Sequences of Routines (i.e. Paths) ....................16

        4.    Implicit Disavowed—Not Just Attempted to Disavow—Preconfigured Sequences of Routines ....................................................................17

    C.    F5's Construction Comports with the Dependent Claims and Embodiments...............19

        1.    Claims 8 and 9 Do Not Allow for Preconfigured Sequences of Components ....................................................................................19

        2.    F5's Construction Is Also Consistent with the Embodiments Disclosed in the Specification................................................................................20

    D.    A "Plain and Ordinary Meaning" Construction Does Not Effect Implicit's Disavowal of Preconfigured Paths, or Resolve the Parties' Dispute Over that Disavowal................................................................................................21

V.   CONCLUSION ................................................................................ 22

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alloc, Inc. v. Int'l Trade Comm'n,*
    342 F.3d 1361 (Fed. Cir. 2003)..................................................................................8, 13, 15

*C.R. Bard, Inc. v. U.S. Surgical Corp.,*
    388 F.3d 858 (Fed. Cir. 2004)...............................................................................................8

*In re Hubbell,*
    709 F.3d 1140 (2013).............................................................................................................3

*Laitram Corp. v. Morehouse Industries, Inc.,*
    143 F. 3d 1456 (Fed. Cir. 1998).........................................................................................18

*Markman v. Westview Instruments,*
    52 F.3d 967 (Fed. Cir. 1995).................................................................................................8

*Microsoft Corp. v. Multi-Tech Systems, Inc.,*
    357 F. 3d 1340 (Fed Cir. 2004)..........................................................................12, 13, 15, 18

*Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,*
    976 F.2d 1559 (Fed. Cir. 1992)............................................................................................6

*Molinaro v. Fannon/Courier Corp.,*
    745 F.2d 651 (Fed. Cir. 1984)............................................................................................18

*Nystrom v. TREX Co.,*
    424 F.3d 1136 (Fed. Cir. 2005).............................................................................................8

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co. Ltd.,*
    521 F.3d 1351 (Fed. Cir. 2008).....................................................................................21, 22

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005).....................................................................................6, 7, 15

*RF Delaware, Inc. v. Pacific Keystone Technologies,*
    326 F. 3d 1255 (Fed. Cir. 2003).........................................................................................18

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
    242 F.3d 1337 (Fed. Cir. 2001).............................................................................................8

*Skilstaf, Inc. v. CVS Caremark Corp.,*
    669 F. 3d 1005 (9th Cir. 2012)...........................................................................................18

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)...............................................................................................6

1

*Wang Labs., Inc. v. Am. Online, Inc.*,
   197 F.3d 1377 (Fed. Cir. 1999) ...........................................................................................13, 15

2

**Regulations**

3

37 C.F.R. 1.321 .............................................................................................................................3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.     INTRODUCTION**

2           In the prior case between the parties, the Court found that Implicit had disavowed the use of

3    preconfigured sequences of routines or paths:

4                "Implicit's Amendment and Response makes clear that what it was
             disclaiming in the prior art ***was use of preconfigured sequences of***
5            ***routines, in other words preconfigured paths***. *See* 9/1/09
             Amendment and Response at 18 ("[T]he sequence of conversion
6            routines (or 'path') is not configured prior to receiving the first
             packet of a message.")

7

8    Ex. R, Motion for Summary Judgment Order at 24:4-7 (emphasis added).  Because F5's products rely

9    exclusively on preconfigured processing sequences, the Court found that F5 could not infringe

10   Implicit's patents.  Indeed, based on undisputed facts, the Court concluded that F5's product

11   "functions in a way that is contrary to the purpose of Implicit's inventions." *Id*. at 27:27-28.

12          Three months after the Court's order ending the prior case, Implicit went back to the patent

13   office with a new set of claims on the same specification, trying to maneuver around the Court's

14   order.  But Implicit's new claims—just like its old claims—still require "***a sequence of routines*** for

15   processing packets in the message" (or similar language), and—just like Implicit's old claims—

16   Implicit's disavowal precludes the use of sequences of routines or paths that are preconfigured.  This

17   disavowal is plainly stated in the specification that the new patent shares with the patents from the

18   prior case—a disavowal that Implicit told the United States Patent and Trademark Office ("USPTO")

19   was ***"critical" and "clearly states"*** that its purported invention encompasses only sequences that are

20   not preconfigured.

21          But just as it did in the prior case, Implicit is again trying to recapture the use of

22   preconfigured sequences of routines that it indisputably disavowed.  Implicit protests that the

23   disavowal is irrelevant because the claim language has changed.  But the new claim language does

24   not matter.  Implicit's centerpiece disavowal ***is in the shared specification***, and applies with equal

25   force here, along with Implicit's further explanation of that disavowal in the prosecution of the parent

26   patent.  Indeed, the heart of Implicit's invention is that it does not identify the routines to process a

27   particular message until after the message has arrived, thereby relieving a developer of the burden of

28   preconfiguring the system for all possible sequences.  Established Federal Circuit case law makes

1  clear that this disavowal of preconfigured paths—the hallmark of Implicit's alleged invention—limits
2  the claims of the '683 patent.

3         F5's construction follows Implicit's disavowal exactly.  A sequence or list of software
4  [conversion] routines is one that "was not configured (i.e., the individual routines comprising the
5  sequence were not identified) before the first packet of a message was received."  This construction
6  accords with Implicit's disavowal, and, contrary to Implicit's arguments, with the claims of the new
7  patent and the disclosed embodiments.  Implicit's construction brushes past its own disclaimer,
8  proposing that the sequence/list of routines terms be given only their plain and ordinary meaning, and
9  *not* the meaning that Implicit gave them through its disavowal.  Implicit hopes that by keeping its
10 construction vague, it can keep its case in play; however, the correct construction of "sequence/list of
11 routines" ends Implicit's case, again.

12 **II.     FACTUAL BACKGROUND**

13        **A.     The '683 Patent Was Born From the Previously Litigated '163 and '857 Patents**

14        The '683 patent is a continuation of U.S. Patent No. 6,629,163 ("the '163 patent")—one of
15 the previously litigated patents that this Court determined were both invalid and "contrary" to F5's
16 system. Ex. B, '163 patent; Ex. R, Motion for Summary Judgment Order at 27:27-28.[1]  Implicit filed
17 the '683 patent application on June 6, 2013, just three months after the Court's March 13, 2013
18 summary judgment order in the prior case, and just before Implicit dropped its appeal of that order on
19 June 28, 2013. *See Implicit Networks Inc. v. F5 Networks, Inc.*, Federal Circuit Case No. 13-1440,
20 Doc. 17.

21        The USPTO initially rejected the '683 patent application, because, among other reasons, it
22 was not "patentably distinct" from the '163 parent and "comprise[s] the same elements."  Ex. L, '683

---

23

24 [1] The second previously litigated patent was another continuation of the '163 patent, U.S. Patent No.
25 7,711,857 ("the '857 patent").  Ex. C, '857 patent.  Both the '163 patent and the '857 patent
   underwent re-examination.  The '163 patent was subject to two.  The first concluded before Implicit
26 filed the prior lawsuit against F5, and resulted in amendments to the '163 patent claims.  The second,
   filed by Juniper Networks, rejected the claims of the '163 patent, but the re-examination was
27 terminated in view of the Court's summary judgment order of invalidity.  Juniper also filed a re-
   examination on the '857 patent, in which the United States Patent and Trademark Office ("USPTO")
28 rejected the claims.  It, too, was terminated in view of the Court's invalidity judgment.

1  patent prosecution, Office Action, September 19, 2013 at p. 2-3.  To overcome this "double

2  patenting" rejection, Implicit filed a terminal disclaimer on December 19, 2013, along with additional

3  amendments to the claims.[2]  The patent eventually issued last year on April 8, 2014.

**B.    Implicit's Alleged Invention Requires "On the Fly" Identification of Each
        Component in a Processing Sequence, After Data Hits the System**

6        The '683 and '163 patents' common specification describes an "invention" directed to a

7  conversion system that receives messages in various formats (such as MPEG videos or HTML

8  pages), converts the message to the appropriate format for a target device residing in, for example, a

9  television set-top box or personal computer, and then routes the message to the device for an end

10  user.  Ex. A, '683 Patent at 2:42-3:1.  The supposed distinguishing feature of the Implicit system is

11  the particular way it builds a processing path for conversion and routing.  Implicit's system identifies

12  each individual software routine (i.e. component) in the sequence of components "on-the-fly" <u>after</u>

13  data is received by the system.  Ex. A '683 patent, 1:45-50; Ex. E, '163 1st reexamination,

14  Amendment and Response to Office Action Mailed July 7, 2009 at p. 18.

15        The prior art, by contrast, set all possible sequences of conversion routines <u>before</u> data

16  arrived. According to the patents' shared specification, then-existing computer systems processing a

17  wide variety of data formats "typically used predefined configuration information to load the correct

18  combination of conversion routines for processing data."  Ex. A, '683 Patent at 1:48-50; *see also id.*

19  at 1:45-50.  And therein lies the problem that Implicit's invention purportedly addresses:

20  preemptively identifying every possible series of conversion routines when only an unforeseeable

21  subset will be required to handle the messages that actually arrive.  *See id.*  As the patent claims,

---

[2] To overcome a double patenting rejection, an applicant may file a terminal disclaimer, agreeing that any patent that results from the application shall only be enforceable for the same period as the earlier patent, and so long as it is commonly owned with the earlier patent.  37 C.F.R. 1.321.  The rationale for the prohibition on double patenting and the accompanying terminal disclaimer requirements, including common ownership, is two-fold: first, to prevent patentees from extending the life of protection for an invention through multiple patents, and second, to prevent duplicative, harassing litigation by different assignees asserting essentially the same invention. *In re Hubbell*, 709 F.3d 1140, 1145 (2013).

1    "[t]he overhead of statically providing each possible series of conversion routines is very high." *Id.*

2    at 1:57-59.

3         Implicit repeatedly separated its alleged invention from one particular "static" system,

4    Mosberger's Scout.  Implicit's opening brief says a lot about Mosberger, much without any

5    evidentiary cites or clear purpose.  *See Implicit's Opening Brief ("IOB")* at 4:13-8:9.  But Implicit's

6    distinction between prior art systems like Mosberger and its alleged invention is both simple and

7    unequivocal.  According to Implicit, "… it is clear that the paths in Mosberger are ***configured (i.e.,***

8    ***the sequence of modules comprising the paths is defined)*** before receiving message packets."  Ex.

9    E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7, 2009 at p. 13

10   (emphasis added).  Importantly, Implicit drew this line *before* and *independent of* any of the

11   amendments to the '163 claims that Implicit now argues differentiate the '163 patent from the '683

12   patent.  *See id*; Ex. G, '163 1st reexamination, Amendment and Response to Office Action mailed

13   Dec. 4, 2009 at fn 1.  Implicit's distinction over Mosberger is not unique to particular claim language.

14   It is at the core of Implicit's invention.

15        As the Court explained in both its Claim Construction and Summary Judgment orders in the

16   prior case:

17             the <u>heart</u> of the patents' invention is a networking process where
18             'discrete computer function[s], *e.g.*, processing http server requests
             over TCP/IP, streaming a video web-based client, or managing voice-
19             over-ip calls, would be built into a discrete software module, called a
             "bead."  The system devised could 'dynamically' 'receive a stream of
20             data – say video – determine what services were necessary to render
             that content and where the content was to be rendered, and then
21             assemble – or string together – the requisite service beads (modules) at
             run-time.'…. **This system, according to Implicit, <u>dramatically</u>**
22             **<u>departed from the prior art</u> where a developer of applications had**
             **to anticipate who would use the applications and for which devices**
23             **and content, and then build-in the ability to handle the anticipated**
             **demands. . . . <u>Given that all anticipated uses had to be</u>**
24             **<u>preconfigured</u> at build-time**, any unanticipated new use, *e.g.*, a
             different format or a different device, would simply break the system.
25             The developer had to have the foresight to specify explicitly all
             possible configurations in advance, a difficult task in a rapidly
26             changing world.

27

28

Ex. R, Summary Judgment Order at 22:19-23:14 (emphasis added) (internal citations omitted); *see also* Ex. P, Claim Construction Order at 2:14-3:1.  Not having to predetermine sequences and processing path ahead of time, but rather identifying processing routines after data hits the system, is the crux of Implicit's purported invention.  The Court held Implicit to the heart of its invention, and its repeated disavowal in the specification and prosecution history of "preconfigured sequences of routines, in other words preconfigured processing paths."  Ex. R, Motion for Summary Judgment Order, Dkt No. 173, at 24:7.   That disavowal ended Implicit's case against F5:

> Implicit *did* disclaim the use of a pre-configured sequence of components, as represented in the BIG-IP products as the Hudchain….
> [F5's product], therefore, **functions in a way that is contrary to the purpose of Implicit's inventions**.

Ex. R, Motion for Summary Judgment Order, Dkt No. 173, 27:11-28. (emphasis added)

While Implicit hopes to again renege on that disavowal, this time with the new '683 patent, it cannot do so.  Every independent claim recites a sequence (or list) of routines.

| 1. A first apparatus for receiving data from a second apparatus, the first apparatus comprising:<br>a processing unit; and<br>a memory storing instructions executable by the processing unit to:<br>    create, based on an identification of information in a received packet of a message, a path that includes one or more data structures that indicate a **sequence of routines** for processing packets in the message;<br>    store the created path; and<br>    process subsequent packets in the message using the **sequence of routines** indicated in the stored path, wherein the sequence includes a routine that is used to execute a Transmission Control Protocol (TCP) to convert one or more packets having a TCP format into a different format. | 10. A non-transitory, computer-readable medium comprising software instructions for processing a message, wherein the software instructions, when executed, cause a computer system to:<br>obtain information from a particular packet of the message, wherein the particular packet has been received by the computer system;<br>use the obtained information to identify an address specifying **a list of conversion routines**;<br>create a path that includes one or more data structures that specify a sequence of sessions, wherein sessions in the sequence correspond to respective ones of the conversion routines in the list;<br>store the created path; and<br>process subsequent packets of the message using sessions specified in the created path, including:<br>    a session associated with a transport layer protocol that is executed to convert one or more packets in a transport layer format into a different format; and<br>    another session associated with a different protocol that is executed, wherein the different protocol corresponds to the different format. |

| 16. A first apparatus configured to receive data from a second apparatus, the first apparatus comprising:<br>a processing unit; and<br>memory storing instructions that are executable by the processing unit to:<br>    obtain and analyze information from a received packet of a message;<br>    identify an address based on the obtained information, wherein the address references a **list of routines**;<br>    create one or more data structures that indicate state information corresponding to routines in the list;<br>    store the one or more data structures; and<br>    process subsequent packets of the message using the state information, including state information that corresponds to a particular routine that is used to execute a protocol to convert packets from an input format to an output format, wherein the particular routine is not executable to convert packets having the output format. | 24. A non-transitory, computer-readable medium comprising program instructions executable by a computer system to:<br>identify information from different headers associated with various layers of a received packet of a message;<br>create, using the identified information, one or more data structures that reference **a sequence of routines**;<br>store the one or more data structures; and<br>process subsequent packets of the message using the sequence of routines referenced by the one or more data structures, including by removing an outermost header of a given packet using a first routine corresponding to a protocol in a first layer and by removing the resulting outermost header using a second routine corresponding to a different protocol in a different layer. |

As discussed below, these sequences of routines cannot be preconfigured.

## III.   CLAIM CONSTRUCTION

Claims are to be construed in light of the "fundamental purpose and significance of the [patented] invention." *Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1566 (Fed. Cir. 1992).   In construing the patent claims, Implicit is bound by what it "actually invented." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  The words of a claim are generally given the "ordinary and customary meaning" they would have to a person of ordinary skill in the art at the time of the invention. *Phillips,* 415 F.3d at 1312-13.  "The court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," which includes both intrinsic evidence (the claims, specification, and prosecution history) and, though less reliable, extrinsic evidence (e.g., dictionary definitions and treatises) concerning relevant scientific principles and the meaning of technical terms. *Id.* at 1312-1314, 1317-1319; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir.

1996).  Moreover, it is a fundamental rule that "claims must be construed so as to be consistent with the specification."  *Phillips*, 415 F.3d at 1316.  Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently with that limitation.  *Id*. As discussed below, in view of Implicit's disclaimer, the new patent claims cannot be read to cover preconfigured sequences of routines.

## IV.     LEGAL ARGUMENT

### A.     The Sequences of Routines in the '683 Patent Cannot Be Preconfigured

The focal point of Implicit's invention is that the sequences of routines are not preconfigured—in other words, the individual components forming the sequence are not identified until after data hits the system.  This focal point is expressly stated in the specification.  The specification, as Implicit acknowledges in its opening brief, "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *IOB* at 3:7-10 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  In the specification here, Implicit distinguished itself from then-existing computer systems that "typically use predefined configuration information to load the correct combination of conversion routines for processing data."  Ex. A, '683 patent at 1:45-50.  This quote from the specification is, as Implicit told the patent office, "critical."  Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7, 2009 at p. 18 (emphasis added).  The quote

> "**clearly states** that the invention requires **the sequence of conversion routines (that form the paths) to be identified at run-time**, and **disavows prior art systems (like Mosberger) that use pre-configured paths**, which are defined at 'build-time' before the first packet of a message is received."

*Id*. at p. 18 (emphasis added).  Implicit further explained that the "…the specification provides '*interpretive guidance*' for the identifying components, namely, that *the sequence of conversion routines (or 'path') is not configured prior to receiving the first packet of a message.*"  *Id*. at p. 18 (emphasis added).  Implicit could not have been more clear: its invention does not use preconfigured sequences of routines.

The Federal Circuit teaches that where, as here, "the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent..." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (citing numerous cases).  This is true even if "the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question." *Id.*  In *SciMed*, the Federal Circuit found the patentee's distinction over prior art based on a particular feature meant that "the claims should not be read so broadly as to encompass the distinguished prior art structure." *Id.* at 1342-1343; *see also Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1369-1370 (Fed. Cir. 2003) (disavowals in specification, including distinctions over prior art, "teach[] that the invention as a whole, not merely a preferred embodiment, provides for play in the positioning of floor panels," even though not recited in the claims); *Markman v. Westview Instruments,* 52 F.3d 967, 979–980, (Fed. Cir. 1995) ("claims must be read in view of the specification, of which they are a part"); *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 866 (Fed. Cir. 2004) (internal quotation marks omitted) ("the specification makes clear at various points that the claimed invention is narrower than the claim language might imply based on a reading of the specification as a whole"); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1142-1146 (Fed. Cir. 2005) ("[a]n examination of the term 'board' in the context of the written description and prosecution history of the [patent-in-suit] leads to the conclusion that the term 'board' must be limited to wood cut from a log).[3]

That is precisely the result warranted, here.  As this Court highlighted in the prior case, Implicit's statements to the patent office cited to the specification "distinguishing prior art systems which 'typically use predefined configuration information' to load the correct series of conversion routines that make up the 'path,'" and Implicit's statements "***make[] clear that what it was disclaiming in the prior art was use of preconfigured sequences of routines,*** in other words preconfigured paths." Ex. P, Claim Construction Order at 6:2-10 (internal citations omitted)

---

[3] This is, of course, in contrast to the admonishment against importing limitations into the specification where the limits relate *solely* to an embodiment, as opposed to the invention on the whole.  *SciMed*, 242 F.3d at 1341.

1   (emphasis added); *see also* Ex. R, Summary Judgment Order at 23:23-24:7; *id*. at 26:7-9 (Implicit

2   "disclaimed the use of 'pre-configured paths'").  Indeed, as the Court found, Implicit "repeated[ly]

3   characteriz[ed] [] its invention as one which was different from prior art because Implicit's patents

4   ***identify the individual components needed [to] process the message (the sequence) dynamically***

5   ***and post-first packet*.**"  Ex. R, Summary Judgment Order at 27:1-4 (emphasis added).  One

6   characterization highlighted in the summary judgment order was Implicit's explanation that

> **configuring** a path at build time **(i.e., identifying the components
> used to process message packets before actually receiving any
> message packets**) is fundamentally different than **configuring a path**
> at run-time (**i.e., identifying the components** for processing message
> packets after receiving the packets). . . .').

10  Ex. R, Summary Judgment Order at 27:4-7 (citing Ex. E, '163 1st reexamination, Amendment and

11  Response to Office Action Mailed July 7, 2009 at p. 12) (emphasis added).[4]

12      F5's proposed construction flows directly from Implicit's notice to the public about the scope

13  of its invention in the specification disavowal, and Implicit's further explanation of that disavowal in

14  the first '163 re-examination.  Importantly, these representations occurred *prior to* and *independent of*

15  the subsequent amendments to the '163 claims that Implicit now says distinguish the '163 parent

16  from the '683 patent.  Implicit's disavowal of preconfigured sequences of routines is not unique to

17  the claim language in the '163 patent; it is rooted in the specification's distinction over prior art,

18  which is the heart of Implicit's invention.  F5's construction of a "sequence/list of [conversion]

19  routines" directly follows Implicit's disavowal:[5]

20

---

21  [4] *See also* Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7,
22  2009 at p. 18 (emphasis in original) ("**The Specification Shows That The 'Sequence of
    Components for Processing the Packets of the Message' Is Not Pre-Configured as in
23  Mosberger, But Rather Created Dynamically After the 'First Packet of the Message' is
    Received**"); Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July
24  7, 2009 at p. 13 (bold emphasis added) ("… **it is clear that the paths in Mosberger are configured
    (*i.e.,* the sequence of modules comprising the paths is defined) before receiving message
25  packets.**").

26  [5] F5's construction also tracks the Court's prior summary judgment and claim construction orders
    requiring that the ("nonpredefined," in some of the claims) sequence of components "was not
27  **configured** (i.e., **the individual routines comprising the sequence were not identified**) before the
    first packet of a message was received."  *See* Ex. R, Motion for Summary Judgment at 26-5-11; Ex.
28  P, Claim Construction Order, at 20-21 (emphasis added).

---

F5'S RESPONSIVE CLAIM CONSTRUCTION BRIEF          Case No. 3:14-cv-02856-SI

| Implicit's Disavowal | F5's Construction |
|---|---|
| **configuring** a path at build time (i.e., **identifying the components** used to process message packets before actually receiving any message packets) is fundamentally different than configuring a path at run-time (i.e., identifying the components for processing message packets after receiving the packets)<br><br>Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7, 2009 at p. 12 (emphasis added). | A sequence [list] of software routines that was not **configured** (i.e., the **individual routines comprising the sequence were not identified**) before the first packet of a message was received |

**B.      Implicit's Proposed Construction Ignores Its Own Disavowal of Preconfigured Paths**

**1.      Implicit Seeks to Renege on Its Disavowal of Preconfigured Paths**

Implicit now hopes to walk away from its disavowal of preconfigured sequences of routines. The reason is obvious:  because of the disavowal, this Court already found that F5's products are the antithesis of Implicit's invention.  Ex. R, Summary Judgment Order at 27:27-28.

In the prior case, Implicit tried to recapture preconfigured sequences of routines by arguing that the claimed sequences were really fully instantiated processing paths.  The Court rejected that argument.  Ex. R, Summary Judgment Order at 26:26-28, 27:1-15.  In response to the Court's Order, Implicit now tries to add an instantiated path to the '683 claim language, and again argue that its invention can cover preconfigured sequences so long as there is some instantiation of an alleged "path" after data hits the system.  But both Implicit's stated invention and the '683 claims themselves require a sequence of routines that cannot be determined until after the message to be processed enters the system.

More specifically, Implicit tries to by-pass its disavowal by adding a separate "path" limitation to the '683 claims, which Implicit purports to be the fully instantiated processing path that Implicit argued in the first case was the "sequence of routines."  In furtherance of its argument, Implicit imagines that it disavowed (or attempted to disavow) preconfigured *sequences of components* only in the '163 reexamination, but separately disavowed preinstantiated *paths* in the

'683 prosecution.  Implicit apparently contends, again, that its invention covers disclaimed preconfigured sequences of routines so long as they are not instantiated into memory until after data hits the system.

But this is a clear maneuver to try to circumvent the Court's holdings in the prior case rejecting *the same read* of Implicit's purported invention.  Implicit argued there, as it does here, that its invention covers a fully pre-identified processing sequence or path, supposedly because the claimed configuration that takes place after data hits the system is the instantiation of the sequence into memory with pointers, and *not* selection of the individual routines for the sequence.  Ex. R, Summary Judgment Order at 26:12-19, 26-28.  The Court flatly rejected Implicit's attempt to re-interpret its invention to allow pre-configured paths instantiated into memory post-data receipt:

> This conclusion is consistent with **Implicit's repeated characterization of its invention as one which was different from prior art because Implicit's patents <u>identify the individual components</u> needed process the message (the sequence) dynamically and postfirst packet.**  See, e.g., 9/1/09 Amendment and Response at 12 ("configuring a path at build time (i.e., identifying the components used to process message packets before actually receiving any message packets) is fundamentally different than configuring a path at run-time (i.e., identifying the components for processing message packets after receiving the packets). . . .").  It was this dynamic selection of components, occurring post-first packet, that would allow Implicit's system to accommodate a message carrying a new format or needing to be delivered to a new device.  It is true that Implicit did not disavow using pre-configured processing information "in some part."  However, Implicit[] did disclaim the use of a pre-configured sequence of components, as represented in the BIG-IP products as the Hudchain.  It is not disputed that the Hudchains which set out the processing routines to be applied to every authorized type of message/flow are defined and loaded into the system's memory prior to the arrival of the first packet.  Therefore, they cannot read on this significant limitation.

Ex. R, Summary Judgment Order at 27:1-15 (emphasis added) (internal citations omitted); *see also id.* at 26:26-28 (internal citations omitted) ("Apparently, this is why Implicit proposed construing 'create'…to mean 'instantiate in memory.'  The Court rejected Implicit's attempt and adopted the plain meaning of create.").

1    Implicit now revives its effort to balloon its patent to allow what is expressly disavowed

2   —preconfigured sequences of components—so long as they are not instantiated into memory until

3   after receiving data (*IOB* at 14:5-20).   Implicit contends that the new claims allow it to do so, and

4   shuttles between arguing that there was a disavowal but it applies to the '163 claims only, there was

5   no disavowal of preconfigured sequences but only an attempted one, and there was a disavowal that

6   is encompassed within the '683 claims.  At times, Implicit appears to agree that it disclaimed

7   preconfigured sequences of components, and at other times not.  The reasoning is confusing because

8   Implicit created, and is now trying to walk on, a tightrope between a "path" and a "sequence of

9   routines."  The trouble for Implicit, however, is that its disclaimer of a preconfigured sequence of

10  routines goes to the heart of its invention, and thus, cabins the scope of the '683 claims.  None of

11  Implicit's reasons for attempting to liberate itself from that disavowal are persuasive.  Each is

12  discussed in turn below.

13          **2.     Implicit's Disavowal of Preconfigured Sequences of Routines Goes to the
                      Heart of Its Invention, and Therefore Bounds the '683 Claims**

14

15          Implicit argues that its disavowal of preconfigured sequences is of no consequence because

16  the '683 claims differ from those in the '163 patent; however, Implicit's disavowal is the crux of its

17  invention, with its centerpoint in the patents' shared specification, making the disavowal as pertinent

18  to the '683 patent as the '163 parent.

19          Indeed, the Federal Circuit has—repeatedly—made clear that patentees cannot renege on a

20  disavowal of the fundamental scope of their invention by wordsmithing claim language in a

21  continuation patent.  The appellate court rejected a nearly identical attempt to rewrite history in

22  *Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F. 3d 1340, 1348 (Fed Cir. 2004).  There, only one

23  patent in a family had claim language explicitly specifying that communications occur "over a

24  telephone line."  *Id*. at 1347.  The patentee argued, as Implicit does here, that this was a distinction

25  with a difference.  *Id*. at 1347.  The Federal Circuit disagreed.  *Id*. at 1347-1350.  Looking at the

26  patents' common specification, the Court found that the patentee "repeatedly and consistently

27  describe[d]…the claimed inventions as communicating directly over a telephone line."  *Id*. at 1348.

28  The statements were not limited to a particular embodiment, but instead, "more broadly describe the

1    overall inventions of all three patents." *Id*. at 1348.  What is more, during prosecution of the patent

2    containing the explicit language, the patentee confirmed that the invention applied only to telephone

3    lines. *Id*. at 1349.  Because the disavowal "expressly related" to the shared specification, and was "a

4    representation of [the patentee's] own understanding of the inventions disclosed [in all the patents],"

5    the Federal Circuit enforced the disavowal in every patent in the family. *Id*. at 1350.

6           Similarly, in *Wang Labs., Inc. v. Am. Online, Inc*., 197 F.3d 1377, 1384 (Fed. Cir. 1999), the

7    Federal Circuit held that the term "frame" was limited to character-based systems in view of

8    disavowals in both the specification and the prosecution history of the parent patent.  While "frames"

9    have a broader understanding, the specification in *Wang* disclosed only character-based frames. *Id*. at

10   1382.  The specification's disavowal further unfolded in the parent's prosecution history. *Id*. at 1384.

11   There, the patentee distanced the alleged invention from prior art that operated at the picture, rather

12   than character, level. *Id*.  The patentee insisted that the parent patent's prosecution history had no

13   bearing on the continuation patent; however, the Federal Circuit concluded otherwise, finding that the

14   patent's common subject matter made the parent's history relevant. *Id*; *see also Alloc, Inc. v. Int'l*

15   *Trade Comm'n*, 342 F.3d 1361, 1371-1372 (Fed. Cir. 2003) (disavowals of the invention scope in the

16   prosecution history of the parent relevant because they confirmed disclaimers in the patent family's

17   shared specification).  In short, when the disavowal goes to the heart of the invention, rather just the

18   nuances of particular claim language, as in the cases cited by Implicit (*IOB* 22:25-23:9), the disavow

19   carries through to the continuation patents.

20          Federal Circuit law thus confirms that Implicit's disavowal in the shared specification, and

21   reinforced in the '163 prosecution history, applies with equal measure to the '683 patent.[6]  The

22   disavowal of preconfigured sequences of components is grounded in the ***shared specification***.  Ex. A,

23   '683 patent at 1:45-50.  Implicit represented to the patent office that this specification disavowal was

---

[6] The '683 patent not only shares the same specification with the '163 patent, but is also subject to a
terminal disclaimer in view of the '163 patent, as a result of the USPTO's conclusion that the two
patents were not "patentably distinct" and "comprise the same elements."  Ex. L, '683 patent
prosecution, Office Action, September 19, 2013 at p. 2-3;  Ex. M, '683 patent prosecution, December
6, 2013, Examiner Interview Summary Record ("In addition, Applicant and applicant's representative
agreed to file a terminal disclaimer to overcome the double patenting rejection.")

"critical" and "*clearly states that the invention requires the sequence of conversion routines (that form the paths) to be identified at run-time*, and *disavows prior art systems (like Mosberger) that use pre-configured paths*, which are defined at 'build-time' before the first packet of a message is received." Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7, 2009 at p. 18 (emphasis added).

Consistent with the specification, Implicit—repeatedly and consistently—reiterated its disavowal of preconfigured sequences of components. It did so in the '163 prosecution history, even before the words "non-predefined," "dynamically," or " wherein dynamically identifying includes selecting individual components to create the non-predefined sequence of components after the first packet is received" were even added to the '163 claims. *See e.g.*, Section II(B), *supra*; Ex. G, '163 1st reexamination, Amendment and Response to Office Action mailed Dec. 4, 2009 (amending claims). In other words, before it ever made the amendments to which Implicit now argues its disavowal is tied, Implicit told the patent office that its invention did not cover preconfigured sequences of routines. Implicit also eschewed preconfigured sequences from the '857 claims, despite the absence of the word "non-predefined" in the claims. In doing so, Implicit highlighted the same centerpiece disavowal from the specification: "Most purpose built systems addressed this problem by **preconfiguring each possible sequence of components (referred to as 'paths' or 'processing paths') in the implementation** of the system…This type of predefined configuration of the processing software routines was implemented by the system and unchangeable."). Ex. J, '857 Juniper reexamination, Response to Office Action mailed May 10, 2012 at p. 5-6 (citing specification) (emphasis added).[7]

---

[7] *See also* Ex. Q, Implicit's Supplemental Response to F5's Second Set of Interrogatories, dated July 27, 2012 at p. 6 (emphasis added) ("**Implicit's '163 and '857 patents** turn on creating a message-specific, stateful data processing path post-first packet….**This was in contradistinction to prior systems, e.g. Mosberger, *where the data processing paths were 'predefined'* in the sense of being fixed in the code and unalterable.**"); Ex. J, '857 Juniper reexamination, Response to Office Action mailed May 10, 2012 at pp. 6-7 (emphasis added) ("Eschewing conventional wisdom and thinking outside the box, **the inventor of the '857 patent** realized that the solution was not to create systems that were only capable of handling packets that matched the implementation of the system and the types of data for which the implementation was configured….**Rather, the solution was to separate configuration from implementation so the sequence of components would not have to be**

1    This history further confirms that Implicit's disavowal of preconfigured sequences of routines

2  is at the core of its invention, not at the fringes of particular claim language.  It also belies Implicit's

3  contention that F5's construction imports a disavowal exclusively relating to, and words from, the

4  '163 patent into the '683 claims (*see, e.g.*, *IOB* at 16:5-17:16; 20:8-21).  The catalyst for Implicit's

5  prosecution history disclaimers and '163 claim amendments is the—as Implicit calls it, "critical"—

6  disavowal in the specification.  F5's construction gives meaning to Implicit's disavowal.  Under well-

7  settled Federal Circuit law, this disclaimer, at the heart of Implicit's invention, applies equally to the

8  '683 patent.[8]  *See Microsoft*, 357 F. 3d at 1348; *Alloc,* 342 F.3dat 1371-1372; *Wang Labs*, 197 F.3d at

9  1384.

10

11

12

---

13  **predefined in the implementation of the system**….Unlike previous methodologies-which had fixed
network stacks in a predefined order based on implementation (*see, e.g.*, Scout)-the '857 specification

14  discloses a system that uses configuration information after the first packet is received to determine
how to dynamically construct a processing path."); Ex. N, Implicit's Claim Construction Opening

15  Brief, 11:4 (emphasis added) ("A key limitation *in all claims* is a 'non-predefined sequence of
components'"); Ex. J, '857 Juniper reexamination, Response to Office Action mailed May 10, 2012 at

16  p. 17 (emphasis added) (distinguishing '857 patent from Descasper reference because "Decasper
describes a router architecture that consists of an lP router core **containing a predefined sequence of**

17  **numerous 'components'** and 'gates' that process each packet received by the router"); Ex. J, '857
Juniper reexamination, Response to Office Action mailed May 10, 2012 at pp. 9-10 (emphasis added)

18  ("In fact, the '857 patent states that '[w]hen a packet of a message is received, the conversion
system…**identifies a sequence of conversion routines [i.e., creates a 'path']** for processing the

19  packets of the message by comparing the input and output formats of the conversion routines.' '857
patent at 2:41-46.  This is done by examining the packets of the message layer by layer (where the

20  layers might be Ethernet/IP/TCP as described in the previous paragraph), using a mapping process to
identify the sequence that should be associated with the message, and then creating the message-

21  specific sequence of processing components (*i.e.*, the path).  '857 patent at 3:63-4:67. **Importantly,
the patent provides that the sequence of software routines (or 'components') for processing the**

22  **packets is not identified until <u>after</u> the first packet of a message has been received**. '857 patent at
2:39-55."); Ex. J '857 Juniper reexamination, Response to Office Action mailed May 10, 2012 at p.

23  19 (italicized bold emphasis added) ("It is clear, therefore, that all packets in Decasper receive the
<u>**same**</u> general processing through the IP core, and all packets are processed by the <u>**same**</u>

24  predetermined number of gates in the <u>**same**</u> predetermined order…the <u>**sequence**</u> of those gates *has
been predefined in contrast to the claim requirements.*")

25

26  [8] Implicit's further contention that the words in F5's construction (*see IOB* at 13:18-14:20) do not
appear in the claim language misses the point.  The law does not require that the words in a

27  construction appear in the claims themselves.  *See Phillips*, 415 F.3d at 1315-1317 (to construe terms,
courts consider the context of the claims, along with the specification and prosecution history, as well

28  as relevant extrinsic evidence).  Indeed, to hold otherwise would render claim construction a circular
exercise.  The pivotal point is that F5's construction tracks Implicit's disavowal, and to the letter.

1

### 3.   The '683 Patent's Use of the Word "Path" Does Not Negate Implicit's Disavowal of Preconfigured Sequences of Routines (i.e. Paths)

2

3        Implicit's disavowal of preconfigured sequences of routines is not undone by the '683 patent

4   claims' recitation of the word "path."  In another plot to maneuver away from its disavowal, Implicit

5   argues that the '683 patent disclaims only preconfiguration of a path, which is, in Implicit's —

6   current—view, a sequence of routines and the instantiation of the routines in memory.  Implicit's

7   dubious line drawing between a "path" and a "sequence of routines" directly contradicts Implicit's

8   repeated, consistent treatment of a path and a sequence of routines/components as one and the same.

9   Implicit's own opening brief cites one such instance:  "Most purpose built systems addressed this

10  problem by preconfiguring each possible ***sequence of components (referred to as "paths or***

11  ***processing paths.")***.  *IOB* 22:1-9 (citing Ex. 20 at 5) (emphasis added).  There are many, many

12  more.[9]  Implicit is simply trying to call a spade a heart, building its argument on a house of cards.

13

---

14  [9] *See e.g.*, Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7,
    2009 at p. 18 ("…Thus, the specification provides 'interpretive guidance' for the identifying
15  components, namely, that **the sequence of conversion routines (or 'path')** is not configured prior to
    receiving the first packet of a message."); Ex. H, '163 Juniper reexamination, Response to Office
16  Action mailed April 3, 2012 at p.5 ("Most purpose built systems addressed this problem by
    **preconfiguring each possible sequence of components (referred to as 'paths' or processing**
17  **paths")**; Ex. E, '163 1st reexamination, Amendment and Response to Office Action Mailed July 7,
    2009 at p. 18 (emphasis added) ("In other words, the '163 Patent clearly states that the invention
18  requires **the sequence of conversion routines (that form the paths)** to be identified at run-time, and
    disavows prior art systems (like Mosberger) that use pre-configured paths, which are defined at
19  'build-time' before the first packet of a message is received."); Ex. I, '163 Juniper reexamination,
    Comments to PTO's Action Closing Prosecution October 1, 2012 at p.1 (emphasis added) ("**The**
20  **sequence of components, *i.e.*, the 'path,'** is then stored and used-along with message-specific state
    information-to process the subsequent packets of the message"); Ex. K, '857 Juniper reexamination,
21  Comments to PCT's Action Closing Prosecution December 21, 2012 at p. 1 (emphasis added) ("**The**
    **sequence of components, *i.e.*, the 'path,' is then stored** and used-along with message-specific state
22  information-to process the subsequent packets of the message."); Ex. J, '857 Juniper reexamination,
    Response to Office Action mailed May 10, 2012 at p. 9-10 (emphasis added) ("In fact, the '857
23  patent states that '[w]hen a packet of a message is received, the conversion system…**identifies a**
    **sequence of conversion routines [i.e., creates a 'path']** for processing the packets of the message
24  by comparing the input and output formats of the conversion routines…using a mapping process to
    identify the sequence that should be associated with the message, and then creating the message-
25  specific sequence of processing components (*i.e.*, the path).")  The Court also recognized them as
    interchangeable.  *See* Ex. P, Claim Construction Order, 6:2-4 ("In that Response, Implicit cited to the
26  '163 specification distinguishing prior art systems which 'typically use predefined configuration
    information' to load the correct series of conversion routines that make up the 'path.'  *Id.*, at 6:5-6.
27  However, Implicit's Amendment and Response makes clear that **what it was disclaiming in the**
    **prior art was use of preconfigured sequences of routines, in other words preconfigured paths**.")

28

1    But even assuming *arguendo*, that a path was somehow different, it would have no bearing on

2 the impact of Implicit's disavowal of preconfigured sequences of routines on the '683 claims.

3 Implicit's re-interpretation of "path" forgets that *every* independent claim recites a sequence of

4 routines—which, pursuant to Implicit's specification disclaimer, must not be configured before the

5 first packet of the message.  Thus, even if Implicit's read was correct (an issue that this Court need

6 not reach) the instantiation of routines represent merely additional steps or proverbial "bells and

7 whistles."  The genesis point of Implicit's invention is its disavowal of preconfigured sequences of

8 routines.  *See* Ex. A, '683 patent, 1:45-50; Ex. E, '163 1st reexamination, Amendment and Response

9 to Office Action Mailed July 7, 2009 at p. 18.   Even if those routines must also be instantiated into

10 memory in order to qualify as the path in the '683 patent, they still cannot be configured (i.e. the

11 individual components forming the sequence identified) until data hits the system.[10]

12          **4.     Implicit Disavowed—Not Just Attempted to Disavow—Preconfigured
                     Sequences of Routines**
13

14    Recognizing that its disavowal of preconfigured sequences of routines permeates the '683

15 claims, Implicit tries to wrestle itself away from the disavowal's reach by arguing that its disavowal

16 was not *really* a disavowal.  Implicit posits that because the USPTO required Implicit to amend its

17 '163 claims to more clearly state its disclaimer of preconfigured sequences of routines, no disavowal

18 occurred.  (*IOB* at 20:8-21:26; 22:12-25).  Essentially, Implicit says that it should not be held to its

19 word.  The law accords with common sense on this point.  The fact that the USPTO made Implicit

20 amend its claims to more clearly express the disavowal of preconfigured sequences does not undo it.

21 As the Federal Circuit has "stated on numerous occasions," "a patentee's statements during

22 prosecution, whether relied on by the examiner or not, are relevant to claim interpretation."

23

_____

24 [10] Implicit suggests that the patent office "passed on" its read, allowing preconfigured sequences of
   components in view of the different claim language (*IOB* at 18:8-24).  Of course, this is contrary to
25 the patent office's finding that the '683 patent claims are not "patentably distinct" from the '163
   claims.  Ex. L, '683 patent prosecution, Office Action, September 19, 2013 at p. 2-3.  Implicit's
26 conjecture is also at odds with the fact that Implicit never told the patent office that it intended to
   renege on its disavowal of sequences of components, or otherwise draw a path/sequence distinction.
27 The intrinsic record more aptly suggests that the examiner reasonably assumed that a path and a
   sequence were one in the same, just as Implicit had used them previously.
28

1    *Microsoft*, 357 F.3d at 1350; *see also Laitram Corp. v. Morehouse Industries, Inc.*, 143 F. 3d 1456,

2    1462 (Fed. Cir. 1998) (internal citations omitted) ("'Regardless of the examiner's motives, arguments

3    made during prosecution shed light on what the applicant meant by its various terms'…The fact that

4    an examiner placed no reliance on an applicant's statement distinguishing prior art does not mean that

5    the statement is inconsequential for purposes of claim construction.")  Tellingly, Implicit offers no

6    USPTO finding that a disavowal did not occur, and absolutely no case law support for its position.

7         There is a binding holding of just the opposite.  This Court found that Implicit had

8    disavowed— *not tried to, not attempted to*— preconfigured sequences of routines/components:

9    "Implicit *did* disclaim the use of a pre-configured sequence of components…"  Ex. R, Summary

10   Judgment Order at 27:11-12 (emphasis in original).  Implicit's theory jettisons this Court's holding in

11   the prior case despite its preclusive effect.  *See Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F. 3d 1005,

12   1021 (9th Cir. 2012) (issue preclusion bars relitigation of issues adjudicated in an earlier proceeding

13   if: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought

14   to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party

15   against whom collateral estoppel is asserted was a party or in privity with a party at the first

16   proceeding); *RF Delaware, Inc. v. Pacific Keystone Technologies,* 326 F. 3d 1255, 1261 (Fed. Cir.

17   2003) ("the Federal Circuit applies regional circuit law to collateral estoppel"); *Molinaro v.*

18   *Fannon/Courier Corp.*, 745 F.2d 651, 655 (Fed. Cir. 1984) ("where a determination of the scope of

19   patent claims was made in a prior case, and the determination was essential to the judgment there on

20   the issue of infringement, there is collateral estoppel in a later case on the scope of such claims, i.e.,

21   the determined scope cannot be changed").

22        Implicit's attempted disavowal theory is a fiction.  Implicit devised it to distract from the true

23   import of its disavowal—that is, Implicit made the disavow *before* amending the original '163 patent,

24   further reinforcing that the disavowal is inherent to the invention itself, not just particular claim

25   language.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## C.    F5's Construction Comports with the Dependent Claims and Embodiments

F5's construction effects Implicit's disavowal and is consistent with both the '683 dependent claims and the disclosed embodiments in the specification, contrary to Implicit's arguments otherwise.

### 1.    Claims 8 and 9 Do Not Allow for Preconfigured Sequences of Components

First, none of the '683 claims allow for preconfigured sequences of components—including Claims 8 and 9.  Implicit argues that these claims permit path creation using preconfigured sequences already available once data hits the system (*IOB* at 15:1-16:3).  But these dependent claims do not relate to the configuration of a sequence of routines before data first hits the system with the first packet of a message; rather, they relate to the last step of independent Claim 1, *i.e.* processing *subsequent* packets in the message using a sequence of routines that was created after receiving the first packet of the message:

> …a memory storing instructions executable by the processing unit to:
> create, based on an identification of information in a received packet of
> a message, a path that includes one or more data structures that indicate
> a sequence of routines for processing packets in the message;
> store the created path; and **process subsequent packets in the**
> **message using the sequence of routines indicated in the stored**
> **path**…

Ex. A, '683 Patent, Claim 1 (emphasis added).

Simple grammar makes this point clear.  Claim 8 describes an address that indicates the routines in the sequence of routines of the *created* path—meaning that the path *has already been created* at this point: "The first apparatus of claim 1, wherein the memory stores instructions executable by the processing unit to identify an address associated with the information, **wherein the address indicates the routines in the sequence of routines of the created path**." Ex. A, '683 Patent, Claim 8 (emphasis added).

Claim 9 continues with further post-path creation steps.  It outlines that the apparatus of Claim 8 (and in turn Claim 1)'s memory "stores instructions executable by the processing unit to use the address"—i.e. the address in Claim 8 indicating the routines in the *created* path—"to select the sequence of routines from a plurality of sequences of routines that are stored by the first apparatus

prior to receiving the packet of the message." In other words, here, the system selects the sequence of routines (previously created, but upon receipt of the first packet of the message) for the subsequent packets of that message. This process makes sense in view of Claim 9's reference to routines stored prior to "the packet" (and not "the *first* packet of the message"). These routines are stored after being created post-first packet, for the efficient processing of subsequent packets of the same message, as recited in Claim 1. Ex. A, '683 Patent Claim 1. Indeed, the specification contemplates this exact scenario, in which the system first creates and then, for subsequent packets, chooses from, multiple sequences, each for a different output device (e.g. one for an iPad and the other for a television). Ex. A, '683 Patent, 7:42:47. ("A packet may be processed by several different paths. For example, if a certain message is directed to two different output devices, then the message is processed by two different paths").

The selection of stored sequences of routines in Claims 8 and 9 has nothing to do with the heart of Implicit's invention: selecting preconfigured sequences when the first data packet hits the system. Thus, there is no disconnect between these dependent claims and F5's proposed construction.

### 2.    F5's Construction Is Also Consistent with the Embodiments Disclosed in the Specification

Second, F5's proposed construction also harmonizes with the disclosed embodiments. Implicit contends that disclosed embodiments in the '211 patent, incorporated by reference into the '683 patent, allow for preconfigured sequences of routines in the context of the '683 patent (*IOB* at 17:18-25). Implicit is mistaken.

For example, the '211 patent cache stores paths that were previously configured *post-first packet* for processing subsequent packets—a point that F5 explained during claim construction in the prior case, and with respect to the same passage Implicit highlights here (*IOB* at 8:22-24). As described in the '211 specification, "[t]he conversion system uses the caches of the media to identify paths that are ***dynamically identified***." *See* Ex. O, F5's Opening Brief, at fn. 14 (citing Ex. D hereto, '211 patent at 6:46-48) (emphasis added).

1    And with regard to the label (or media) map get routine, Implicit pointed to the same

2    embodiment in the prior case, hoping to prove that the label map get routine allowed selection of a

3    preexisting path.  *See* Ex. S, Implicit's Reply Claim Construction Brief, at 7:1-9:11.  But as F5

4    explained then, this embodiment allows merely for identification of the first three modules in a

5    sequence, followed by subsequent identification of the remaining routines, and not selection of a fully

6    identified sequence.  *See* Ex. O, F5's Opening Brief, at fn. 14.  The Court rejected Implicit's attempt

7    to misconstrue the media map get routine, finding that "although Implicit's inventions may rely[] in

8    some part on predefined configuration information in light of the LabelMapGet function used in a

9    preferred embodiment, Implicit disclaimed use of a pre-defined sequence of processing components."

10   Ex. R, Summary Judgment Order, at 29:23-26 (internal quotations omitted).[11]

11        **D.    A "Plain and Ordinary Meaning" Construction Does Not Effect Implicit's**
               **Disavowal of Preconfigured Paths, or Resolve the Parties' Dispute Over that**
12             **Disavowal**

13        While F5's construction imparts the meaning and scope of "sequences/list of routines" in

14   view of Implicit's disavowal, Implicit's plain meaning proposal effectively asks the Court to punt a

15   determination on the central dispute between the parties:  whether the sequences of routines can be

16   preconfigured.  Implicit hopes that a plain meaning construction will keep its case alive.

17        However, a dispute regarding the meaning and scope of any limitation, let alone a critical one,

18   must be resolved by the Court through claim construction.  *O2 Micro Int'l Ltd. v. Beyond Innovation*

19   _____

20   [11] Implicit raises several other miscellaneous complaints about F5's construction.  Each is without
     merit.  *First*, Implicit rehashes its argument from the prior case that F5's construction precludes
21   "configuration information" other than preconfigured sequences of routines (*IOB* 24:25-25:5).  But
     Implicit forgets that F5's construction uses Implicit's own definition of configuring a sequence of
22   routines (i.e. identifying the individual components), and does so in order to heed this Court's
     distinction in the prior case between generalized configuration information and preconfigured
23   sequences of components. Ex. P, Claim Construction Order at 6:8-10 ("Implicit did not disclaim the
     ability to create a sequence of conversion routines by relying in some part on predefined
24   'configuration information,' but only the use of pre-configured paths").  F5's construction follows
     this Court's holding that a disavowal of preconfigured sequences does not impermissibly exclude
25   some configuration information.  *Second*, there is no merit to Implicit's request to incorporate a host
     of unsupported attorney rhetoric about the operation of Mosberger into the construction (*IOB* at
26   23:26-24:9).  Again, F5's construction applies the direct language from disavowals in the
     specification and prosecution history, along with the Court's orders.
27

28

*Tech. Co. Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  In *O2 Micro*, the Federal Circuit rejected the

patentee's position that the term "only if" was a common term with a common meaning, and did not

need construction.  *Id.* at 1360.  Even though the parties did not dispute the meaning of the words

themselves, the parties did dispute the scope encompassed by the claim language.  *Id.* at 1361.  A

dispute on claim scope must be resolved through claim construction.  *Id.* at 1361.  Determining that a

claim term has a "plain and ordinary meaning" or "needs no construction" does not suffice when

there is more than one ordinary meaning, or when reliance on the ordinary meaning fails to settle the

parties' dispute.  *Id.* at 1361-62.  Implicit's plain meaning construction leaves the parties' dispute

open.  The dispute is not whether the components are an ordered arrangement of software routines

(Implicit's proposed plain meaning, and alternative construction).  The dispute is *when* those routines

must be configured, given Implicit's disavowal of preconfigured sequences of routines.[12]  Under *O2*

*Micro*, this pivotal dispute cannot remain resolved.

## V.    CONCLUSION

Implicit's clear disavowal of preconfigured paths is not a disclaimer on the periphery of the

claims.  The disavowal goes to the very "heart" of Implicit's invention.  *See* Ex. R, Motion for

Summary Judgment Order at 22:19-23:14; *see also* Ex. P, Claim Construction Order at 2:11-3:1.

Implicit's representations to the patent office, and the public, set a boundary between its alleged

invention, and systems that use preconfigured sequences of routines.  The Court should hold Implicit

to its word, and adopt F5's construction.

---

[12] Implicit tries to make much of the court's construction of "components" as "software routines"
construing a broader term in the prior case. *IOB* at 24:14-19 (citing Ex. 12 at 5-6).  But again, the
dispute is not whether the components are software routines.  Moreover, although Implicit insists that
no disavowal applies to the '683 claims, Implicit incongruently argues that the disavowal is in the
plain language of the claims, obviating the need for construction (*IOB* 19:2-8).  Implicit appears to
refer to its fabricated disavowal of only preconfigured sequences of routines instantiated into
memory, and not preconfigured sequences of routines.  The dispute over the scope of the disavowal
must be resolved via claim construction.

1   Dated:  February 18, 2015                    K&L GATES LLP

2

3                                                By:  /s/ Michael J. Bettinger
                                                 MICHAEL J. BETTINGER (SBN 122196)
                                                 HOLLY HOGAN (SBN 238714)
4                                                K&L GATES LLP
                                                 4 Embarcadero Center, Suite 1200
5                                                San Francisco, California 94111-5994
                                                 Telephone: 415.882.8200
6                                                Facsimile: 415.882.8220
                                                 mike.bettinger@klgates.com
7                                                holly.hogan@klgates.com

8                                                SHANE BRUN (SBN 179079)
                                                 GOODWIN PROCTER LLP
9                                                Three Embarcadero Center, 24th Floor
                                                 San Francisco, California 94111
10                                               Telephone:  415.733.6000
                                                 Facsimile:  415.677.9041
11                                               sbrun@goodwinprocter.com

12

13                                               Attorneys for Defendant
                                                 F5 NETWORKS, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

F5'S RESPONSIVE CLAIM CONSTRUCTION BRIEF                              Case No. 3:14-cv-02856-SI
                                     23